**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:    Justices:
Maura D. Corrigan    Michael F. Cavanagh
   Elizabeth A. Weaver
   Marilyn Kelly
   Clifford W. Taylor
   Robert P. Young, Jr.
   Stephen J. Markman

**FILED JULY 23, 2004**

PEOPLE OF THE STATE MICHIGAN,

     Plaintiff-Appellant,

v                               No. 123553

NICHOLAS E. HOLTSCHLAG,

     Defendant-Appellee.

_____

PEOPLE OF THE STATE OF MICHIGAN,

     Plaintiff-Appellant,

v                               No. 123554

JOSHUA M. COLE,

     Defendant-Appellee.

_____

PEOPLE OF THE STATE MICHIGAN,

     Plaintiff-Appellant,

v                               No. 123555

DANIEL BRAYMAN,

     Defendant-Appellee.

_____

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellant,

v                                     No. 123556

ERICK LIMMER,

    Defendant-Appellee.
_____

BEFORE THE ENTIRE BENCH

MARKMAN, J.

We granted leave to determine if a defendant may be convicted of involuntary manslaughter for a homicide that occurred during the commission of a felony and for which the prosecutor proceeded under a "gross negligence" mens rea theory. We hold in the affirmative and, accordingly, we reverse the decision of the Court of Appeals and reinstate defendant Limmer's conviction of accessory after the fact to involuntary manslaughter and the remaining defendants' involuntary manslaughter convictions.

## I. Facts

On January 16, 1999, a get-together took place at the home of defendant Erick Limmer. Along with Limmer, the other defendants, Joshua Cole, Daniel Brayman, and Nicholas Holtschlag, were watching television, drinking alcohol, and smoking marijuana with three fourteen-year-old girls. At least one of the defendants put gamma hydroxybutrate or

gamma hydroxybutyric acid (both known as GHB) in the girls'
drinks.[1]  Two of the girls became sick and, after several
hours, were taken to the hospital.  One of the girls,
Samantha Reid, died.  The other slipped into a coma but
eventually recovered.

Defendants Brayman, Holtschlag, and Cole were
convicted of involuntary manslaughter and two counts each
of mixing a harmful substance in a drink, which is a
felony.  Defendant Limmer was convicted of accessory after
the fact to manslaughter, mixing a harmful substance in a
drink, delivery or manufacture of marijuana, and possession
of GHB.

Defendants appealed, the appeals were consolidated,
and the Court of Appeals stated that to support an
involuntary manslaughter conviction under a gross
negligence theory, the prosecutor had to establish that
defendants performed a *lawful* act in a grossly negligent
manner.[2]  Because mixing a harmful substance in the girls'
drinks was an unlawful act that is a felony, the Court
vacated the involuntary manslaughter convictions and

---

[1] GHB is sometimes known as the "date rape drug."

[2] Unpublished opinion per curiam, issued March 27, 2003
(Docket Nos. 226715, 227941, 227942 and 241661).

3

accessory after the fact conviction.

## II. Standard of Review

Determining the elements of common-law involuntary manslaughter is a question of law. We review questions of law de novo. *People v Riddle*, 467 Mich 116, 124; 649 NW2d 30 (2002).

## III. Analysis

There are primarily two issues to address in this case. The first concerns the defendants' contention that they cannot be convicted of involuntary manslaughter because the homicide at issue occurred during the commission of a felony and involuntary manslaughter, defendants argue, is, in part, defined by this Court as the killing of another during the commission of an unlawful act that is *not* a felony. The second issue concerns defendants' contention that to be convicted of involuntary manslaughter under a gross negligence theory, which was the theory under which the prosecutor proceeded at trial, the homicide must have occurred during the commission of a *lawful* act, and in this case it occurred during the commission of an unlawful (felonious) act.

### A. Is manslaughter precluded because of a "felony"?

Regarding the first issue, some insight into the early common-law history of the crime of manslaughter and,

4

particularly, its development alongside the felony-murder doctrine, is necessary. Under Lord Coke's traditional "felony-murder" doctrine, a homicide that occurred during the commission of an unlawful act was "murder" punishable by death. See *People v Aaron,* 409 Mich 672, 692; 299 NW2d 304 (1980), in which this Court thoroughly articulated the elusive history of the felony-murder doctrine. The premise behind the traditional felony-murder doctrine was the idea that the intention to perpetrate the unlawful act sufficiently showed the existence of malice aforethought—the requisite mens rea for murder.[3] *Id.* at 717. This was considered true whatever the nature of the underlying crime may have been. *Id.* at 692. Lord Coke's traditional doctrine was heavily criticized for the harsh results it engendered, and it was severely limited even in early

---

[3] "Mens rea" is a term of art referring to the "state of mind that the prosecutor, to secure a conviction, must prove that a defendant had when committing a crime." Black's Law Dictionary (7th ed). "Malice" is defined as: "1. The intent, without justification or excuse, to commit a wrongful act. 2. Reckless disregard of the law or of a person's legal rights. 3. Ill will; wickedness of heart." *Id.* "Malice aforethought," which is the type of malice specifically related to the crime of murder, is defined as "encompassing any one of the following: (1) the intent to kill, (2) the intent to inflict grievous bodily harm, (3) extremely reckless indifference to the value of human life (the so-called 'abandoned and malignant heart'), or (4) the intent to commit a felony (which leads to culpability under the felony-murder rule)." *Id.*

common-law history.  *Id.* at 693-699.  One of the earliest limitations on the traditional doctrine was limiting its application to those homicides that occurred during the commission of a felony or during the commission of an act that was intended to inflict great bodily injury.  *Id.* at 696-697.

Additionally, in the early days of the English common law, the crime of "manslaughter" was developed.  The crime of manslaughter in Michigan is adopted from that early common-law crime.  See *People v Datema,* 448 Mich 585, 594; 533 NW2d 272 (1995): "'The law of manslaughter as it exists today has been adopted from the old English common law.'" (Citation omitted).  Whereas, as noted above, malice is the mens rea required for murder, manslaughter requires a less culpable mens rea.  "'Manslaughter is the unlawful and felonious killing of another without malice, either express or implied.'"  *People v Austin,* 221 Mich 635, 643; 192 NW 590 (1923) (citation omitted).  Involuntary manslaughter has, first and foremost, always been considered the "catch-all" homicide crime.  Thus, in *Datema, supra* at 594-595, we explained, quoting Perkins & Boyce, Criminal Law (3d ed), p 105, that "[i]nvoluntary manslaughter is a catch-all concept including all manslaughter not characterized as voluntary: 'Every unintentional killing of a human being is

6

involuntary manslaughter if it is neither murder nor voluntary manslaughter nor within the scope of some recognized justification or excuse.'" Thus, the catch-all crime of involuntary manslaughter is typically characterized in terms of what it is *not*, and ascertaining whether a homicide is involuntary manslaughter requires essentially questioning first whether it is murder, voluntary manslaughter, or a justified or excused homicide. If it is none of those, then the homicide, generally, is involuntary manslaughter.

In attempting to describe the catch-all crime of involuntary manslaughter in terms of what it *is,* as opposed to what it is *not,* it made sense, starting in the days of early common law, to refer to those homicides that occurred during the commission of an unlawful act that was not intended to cause great bodily injury. This is because, as already explained, under traditional common law, a homicide that occurred during the commission of an unlawful act that was intended to cause great bodily injury constituted murder. Thus, as early as 1886, this Court elucidated the difference between murder and manslaughter in the following manner:

> If an act is unlawful, or is such as duty does not demand, and of a tendency directly dangerous to life, however unintended, it will be

murder. But if the act, though dangerous, is not directly so [i.e., is not directly dangerous to life], yet sufficiently dangerous to come under condemnation of the law [i.e., yet it is unlawful], and death unintended results from it, the offense is manslaughter; or if it is one of a nature to be lawful properly performed, and it is performed improperly, and death comes from it unexpectedly, the offense still is manslaughter. [*People v Stubenvoll,* 62 Mich 329, 340; 28 NW 883 (1886) (quoting 2 Bishop, Criminal Law, § 689).][4]

In 1923, in recognition of the felony-murder doctrine, which was by then widely accepted, this Court presented a somewhat modified version of *Stubenvoll's* manslaughter characterization, stating that manslaughter is "'the killing of another without malice and unintentionally, but in doing some unlawful act not amounting to a felony nor naturally tending to cause death or great bodily harm, or in negligently doing some act lawful in itself, or by the

---

[4] In *Stubenvoll,* the distinction between murder and manslaughter was premised on the nature of the danger posed by the unlawful act rather than the categorization of the unlawful act as being a felony or non felony. This is likely because it was before the "felony-murder" doctrine had gained widespread acceptance. In any case, the Court in *Stubenvoll* recognized the necessity to prove malice in order to convict of murder. *Stubenvoll, supra* at 332. Thus, it is apparent that by holding that a homicide occurring during the commission of an unlawful act that directly tends to cause death is murder, the Court was, in effect, acknowledging that the existence of malice is sufficiently demonstrated if the defendant commits an unlawful act that tends to directly cause danger to human life. As already noted, this is the same premise underlying the "felony-murder" doctrine.

negligent omission to perform a legal duty.'" *People v Ryczek,* 224 Mich 106, 110; 194 NW 609 (1923) (citation omitted).

Until this Court issued *Aaron, Ryczek's* description of the catch-all crime of involuntary manslaughter as consisting of those homicides occurring without malice and unintentionally, but in doing some unlawful act not amounting to a felony nor naturally tending to cause death or great bodily harm, was more or less apt. This is because, generally, a homicide that occurred with malice or intentionally or in committing a felony or in committing an unlawful act naturally tending to cause death constituted murder. However, in *Aaron,* we formally abolished the traditional felony-murder doctrine in Michigan and held that a homicide that occurred during the commission of any crime, including a felony, constitutes murder only if the prosecutor specifically proves the existence of malice. *Aaron, supra* at 727-728. In other words, we held that the intent to commit the underlying felony by itself no longer sufficiently shows the existence of malice. *Id.*

Since this Court's 1980 abrogation of the common-law felony-murder rule in *Aaron,* it is no longer the case that a homicide that occurs during the commission of a felony is, generally, murder per se and, thus, it is no longer apt

9

to describe the catch-all crime of involuntary manslaughter as encompassing crimes that occur during the commission of an unlawful act that is not a felony.  However, the premise of the *Aaron* decision was the rule that a crime is only murder if the prosecutor proves malice.  We stated in *Aaron*, supra *at 726-727,* "'Both murder and manslaughter deal with the wrongful killing of another person. . . . To hold that in all cases it is murder if a killing occurs in the commission of any felony would take from the jury the essential question of malice.'"  (Citation omitted.)  *"If the jury concludes that malice existed, they can find murder . . . ."* *Id.* at 730 (emphasis added).  Thus, *Aaron* relied on the long-standing principle that the distinguishing characteristic between murder and manslaughter is malice. This point was made by this Court as long ago as 1923, when we stated, "[h]omicide is the killing of a human being by a human being.  It . . . is either murder or manslaughter . . . .  To constitute murder, the killing must have been perpetrated with malice aforethought, either express or implied." *Austen, supra* at 644.  "'Manslaughter is the unlawful and felonious killing of another without malice, either express or implied.'"

10

*Id.* at 643 (citation omitted).[5]   This point was recently reiterated by this Court in *People v Mendoza,* 468 Mich 527, 536; 664 NW2d 685 (2003), in which we stated, "the *sole element* distinguishing manslaughter and murder is malice." (Emphasis added.)

Thus, it becomes clear that any post-*Aaron* deficiency in *Ryczek's* description of involuntary manslaughter is not that the description fails now to expressly reference unlawful acts that *are* felonies, but rather that the description continues to reference unlawful acts that are *not* felonies.   This is because the relevant question in determining whether a homicide is murder or involuntary manslaughter is whether it occurred with malice, and not whether it occurred during the commission of an unlawful act—felony or not.   For this reason, defendants cannot opportunistically rely on *Ryczek's* pre-*Aaron* description of the catch-all crime of involuntary manslaughter to argue that, because the homicide at issue occurred during the

---

[5] See also *People v Potter,* 5 Mich 1, 6-9 (1858): "Murder is where a person of sound memory and discretion unlawfully kills [another] with malice prepense or aforethought, either express or implied. . . . [M]alice aforethought is as much an essential ingredient of murder in the second degree, as in that of the first. Without this, the killing would be only manslaughter, if criminal at all."

commission of a felony, they cannot be guilty of manslaughter. That a "felony" has been committed is simply not dispositive in determining whether either "murder" or "manslaughter" has been committed and, thus, the "felony" language in *Ryczek's* manslaughter description is essentially irrelevant.[6]

Defendants argue that, if we hold that a homicide that occurs during the commission of a felony may constitute manslaughter, we nonetheless may not apply the holding in this case because to do so would violate the constitutional provision against ex post facto laws. See US Const, art I, § 10, cl 1: "No State shall . . . pass any . . . ex post facto Law . . . ." In *Bouie v Columbia,* 378 US 347, 353; 84 S Ct 1697; 12 L Ed 2d 894 (1964), the United States Supreme Court explained that an ex post facto law is one "'that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action . . . .'" (Citation omitted). We disagree with defendants because a homicide committed during the

---

[6] We note, however, that while the commission of a felony is not dispositive in determining whether a "murder" has been committed because, pursuant to *Aaron,* evidence of a felony is no longer sufficient proof in itself of malice, the fact that the defendant committed a felony may still be *relevant,* even if not dispositive, evidence that the defendant acted with malice. See *Aaron, supra* at 729-730.

course of a felony could never have been considered an "innocent" homicide merely because it occurred during the commission of a felony. On the contrary, espousing the defendants' argument in this case—that a homicide that occurs during the course of a felony cannot, as a matter of law, be manslaughter—leads to the conclusion then that the homicide (unless justified or excused) is instead murder. It *does not* lead to a conclusion that the homicide is innocent, i.e., a non offense. Thus, our decision in this case does not criminalize that which was, before this decision, "innocent."

Moreover, *Ryczek's* description of involuntary manslaughter was never meant to define the *elements* of the crime of manslaughter. Rather, it was meant to provide guidance to the courts in understanding the circumstances under which the catch-all crime of manslaughter may occur. Therefore, it has never been held by this Court that the prosecutor must specifically prove that the homicide occurred during the commission of an unlawful act that was *not* a felony in order to prove a manslaughter charge. On the contrary, this Court has implicitly and expressly recognized in a number of cases, some decided even before *Aaron,* that while a homicide occurring during the commission of a felony could (pursuant to the felony-murder

13

doctrine) constitute murder, the homicide also could constitute manslaughter—this despite the "felony" language in *Ryczek's* manslaughter description that, during the pre-*Aaron* days, actually had significance.

In *People v Pavlic,* 227 Mich 562; 199 NW 373 (1924), this Court considered whether a defendant could be convicted of manslaughter for a homicide that resulted from the commission of a felony. In *Pavlic*, a man died after drinking liquor sold by the defendant. At the time, selling intoxicating liquor was a felony. Notwithstanding the description of involuntary manslaughter given by this Court in *Ryczek* just one year before—which description, as noted, refers to manslaughter as "'the killing of another . . . in doing some unlawful act not amounting to a felony,'" *Ryczek, supra* at 110 (citation omitted)—*Pavlic* held that the homicide at issue could "constitute manslaughter if performed under such circumstances as to supply the intent to do wrong and inflict some bodily injury." *Pavlic, supra* at 566. The reason the *Pavlic* Court so held was because selling intoxicating liquor is only a "malum prohibitum" felony and not a "malum in se" felony.[7] *Id.* at 566-567.

---

[7] A "malum prohibitum" act is one that "is a crime merely because it is prohibited by statute, although the
(continued…)

This may appear to be grounds to distinguish *Pavlic* from this case, but the essential point is that *Pavlic* recognized that a homicide occurring during the commission of a "felony" could be manslaughter.

Moreover, in so holding, the *Pavlic* Court noted that the important consideration in determining whether a homicide is murder or simply manslaughter in "felony" cases is whether the felony is one that is "in itself directly and naturally dangerous to life." *Id.* at 565. The implication is that the *Pavlic* Court understood that the important question is whether the defendant acted with malice. If the defendant committed a felony that is directly and naturally dangerous to life, then he acted with malice and, therefore, could be convicted of murder. If not, then a manslaughter conviction might be proper. Thus, even in 1924, one year after *Ryczek* and fifty-six years before *Aaron,* this Court impliedly acknowledged that, despite the commission of a felony and the "felony" language in *Ryczek,* the distinguishing element between murder and manslaughter is malice and, therefore, the killing of another in doing some unlawful act that amounts

_____

(…continued)
act itself is not necessarily immoral." Black's Law Dictionary, *supra.* A "malum in se" act is a crime "that is inherently immoral . . . ." *Id.*

15

to a felony *may* constitute manslaughter rather than murder, depending on the facts of the case.

In *People v Treichel,* 229 Mich 303; 200 NW 950 (1924), an elderly gentleman was tied to a bed during the commission of a robbery. He was eventually found dead, and the suspects were charged with first- and second-degree murder and manslaughter and were convicted of manslaughter. The defendants appealed, arguing that they should have been charged only with first-degree murder because the death "was occasioned by act committed in the perpetration of a burglary . . . ." *Id.* at 308. The defendants contended that they should have been either convicted of first-degree murder or acquitted, much as the instant defendants seem to be arguing. The *Treichel* Court, in affirming the defendants' manslaughter convictions, stated:

> Conceding the verdict might have been for murder in the first degree, because death was occasioned by act committed in the perpetration of a burglary, was such a verdict the only one permissible? We cannot so hold. We think the evidence left the question of degree and the included crime of manslaughter to the jury and the court avoided instead of committed error in so submitting it. *Id.*

Thus, in *Treichel,* again just one year after *Ryczek,* this Court affirmed a manslaughter conviction for a homicide that occurred during the commission of a felony despite the "felony" language in *Ryczek.* Presumably, if

16

the Court intended to preclude such convictions by virtue of *Ryczek's* "felony" language, it would not have affirmed the convictions in *Treichel*, but, instead, would have agreed with the defendants that they should have been either convicted of first-degree murder or acquitted.

In *People v Andrus,* 331 Mich 535; 50 NW2d 310 (1951), the defendants burglarized a store and, while doing so, inflicted severe wounds on the owner of the store, who eventually died. As in *Treichel,* the defendants were charged with first- and second-degree murder and manslaughter and were convicted of manslaughter. The defendants appealed, arguing that the manslaughter charge and convictions constituted error. Again, despite the "felony" language of *Ryczek* and the felony-murder doctrine, this Court affirmed the manslaughter convictions in *Andrus.* In doing so, the Court acknowledged that the pivotal issue is the existence of malice: "[W]here there is testimony from which the jury might find the absence of such a felonious intent as is necessary to constitute murder [i.e., malice], an instruction that they might convict of manslaughter should be given." *Id.* at 546.

In *People v Carter,* 387 Mich 397; 197 NW2d 57 (1972), defendants stole a car in order to rob a bank and, in doing so, put the owner of the car in its trunk. The victim died

as a result, and all three defendants were convicted of first-degree murder. In that case, the defendants appealed, arguing that the jury should have been instructed on manslaughter as well as murder. This Court, notwithstanding the "felony" language in *Ryczek,* agreed, vacated the defendants' convictions, and remanded for a new trial.

Simply put, case law demonstrates that the "felony" language in *Ryczek's* description of manslaughter does not have the meaning ascribed to it that defendants would like to have. That is, this language does not mean, as was impliedly acknowledged as long ago as 1924 and was impliedly reaffirmed as recently as 2003, that a defendant may not be convicted of manslaughter if the homicide occurred during the commission of a felony. The pertinent question in distinguishing manslaughter from murder is, as was made absolutely clear in *Mendoza,* whether the defendant acted with malice. If not, then a manslaughter conviction may be proper despite the fact that the death resulted from the commission of an underlying felony. We believe that, in light of the long history of relevant case law and the fact that the homicide in question would never have been an "innocent" homicide, there is no ex post facto violation in affirming Limmer's conviction of accessory after the fact

18

to involuntary manslaughter and the remaining defendants' involuntary manslaughter convictions.[8]

### B. UNLAWFUL-ACT MANSLAUGHTER AND GROSS NEGLIGENCE

Defendants likewise argue that their convictions of manslaughter cannot be sustained because "gross negligence" manslaughter, which is the mens rea that the prosecutor in this case argued that defendants possessed, requires that a

---

[8] We note that this Court's order in *People v Rode,* 449 Mich 912 (1995), in which we affirmed the defendant's convictions of second-degree murder and denied the defendant an instruction on manslaughter because the deaths occurred during the commission of a felony, has already been impliedly overruled by *Mendoza,* in which we held that manslaughter is a necessarily included lesser offense of murder. *Mendoza, supra* at 548. Thus, we held in *Mendoza* that if a defendant is charged with murder, the jury, upon the defendant's request, must also be instructed on manslaughter if a rational view of the evidence supports such an instruction. *Id.* Defendants attempt to explain their position under *Mendoza* by arguing that, because *Ryczek* refers to unlawful acts that are not felonies, a rational view of the evidence will never support an instruction on manslaughter in a case based on the commission of a felony. However, the "rational view of the evidence" proviso in *Mendoza* concerns whether the facts of the specific case rationally fit within the legal purview of manslaughter—the language is not meant to nullify *Mendoza's* statement concerning the legal elements of manslaughter: i.e., that "the sole element distinguishing manslaughter and murder is malice" and that manslaughter is an unintended homicide with a diminished mens rea. *Mendoza, supra* at 536, 541. Accordingly, as clearly explained in *Mendoza,* determining whether a rational view of the evidence may support a manslaughter conviction requires considering whether a rational jury could conclude that the defendant did not act with malice, and not whether death resulted from the commission of a felony.

19

lawful act have been committed, whereas the act committed in this case, pouring GHB into Samantha Reid's drink, was clearly unlawful. In support of this contention, defendants again refer to *Ryczek,* wherein this Court described manslaughter as:

> the killing of another without malice and unintentionally, but in doing some unlawful act not amounting to a felony nor naturally tending to cause death or great bodily harm, *or in negligently doing some act lawful in itself*, or by the negligent omission to perform a legal duty. [*Ryczek, supra* at 110, citation omitted, emphasis added).]

Defendants' argument has no merit. In *Datema, supra* at 596, this Court explained that *Ryczek* "sets forth three different theories giving rise to involuntary manslaughter liability. These theories are not mutually exclusive, and, under the proper circumstances, multiple theories may be appropriate." Thus, it is possible to determine, on the basis of the specific facts at issue, that the act committed by the defendant that resulted in death was, for instance, not only unlawful, but also committed with a mens rea of gross negligence.

In *People v Townsend,* 214 Mich 267, 273-274; 183 NW 177 (1921), this Court provided some early guidance regarding the proofs necessary to demonstrate the "unlawful-act" theory of involuntary manslaughter and the

20

"lawful-act" theory.  *Townsend* provides:

> The distinction between involuntary manslaughter committed while perpetrating an unlawful act not amounting to a felony and the offense arising out of some negligence or fault in doing a lawful act in a grossly negligent manner and from which death results must be kept in mind upon the question of pleading.  In the former case it is sufficient to allege the unlawful act with sufficient particularity to identify it and then to charge that as a consequence the defendant caused the death of the deceased, and there is no need to aver in detail the specific acts of the accused; but in case of manslaughter committed through gross or culpable negligence while doing a lawful act the duty which was neglected or improperly performed must be charged as well as the acts of the accused constituting failure to perform or improper performance.  [*Id.* at 372-274.]

This statement in *Townsend* essentially means that if the defendant committed an *unlawful* act that resulted in death, it is sufficient to allege the commission of the unlawful act and the resulting death; whereas, if the defendant committed a lawful act resulting in death, the prosecutor must specifically allege the manner in which the defendant's actions were grossly or culpably negligent. That is, under *Townsend,* lawful-act manslaughter requires that the defendant acted with a mens rea of culpable negligence; whereas unlawful-act manslaughter does not require that the defendant acted with a specific mens rea— all that is required is that the defendant committed the unlawful act.

21

In *Pavlic,* this Court considered, as noted above, whether a defendant can be convicted of involuntary manslaughter for a death resulting after the defendant committed the unlawful act of selling intoxicating liquor. The Court explained that a manslaughter conviction may be appropriate, but that, because this unlawful act is only malum prohibitum rather than malum in se, it is only appropriate if the prosecutor specifically proves that the defendant acted with a culpable mens rea. The Court essentially equated malum prohibitum unlawful acts with lawful acts, stating

> The act of selling or furnishing intoxicating liquor in violation of the statute is what the law terms an act *malum prohibitum,* a crime existing only by reason of statutory prohibition. An unlawful act of this character which unintentionally causes the death of another, is not in itself a sufficient basis for a charge of involuntary manslaughter.[9] But the commission of such an [malum prohibitum] unlawful act will constitute manslaughter if performed under such circumstances as to supply the intent

---

[9] The corollary of this assertion is that an unlawful act which is not malum prohibitum, but is rather malum in se, is "in itself" a sufficient basis for a charge of involuntary manslaughter. This is essentially the position taken in *Townsend, supra*, that (malum in se) unlawful-act manslaughter does not require that defendant acted with a specific mens rea—all that is required is that defendant committed the (malum in se) unlawful act and that death resulted therefrom.

to do wrong and inflict some bodily injury. . . . The rule is well stated in *Thiede v. State,* 1096 Neb 48 (182 N.W. 570 [1921]), as follows: "We believe the rule to be that though the act made unlawful by statute is an act merely *malum prohibitum* and is ordinarily insufficient, still when such an act is accompanied by negligence or further wrong so as to be in its nature, dangerous, or as to manifest a reckless disregard for the safety of others, then it may be sufficient to supply the wrongful intent essential to criminal homicide [and] when such an act results in the death of another, may constitute involuntary manslaughter." [*Pavlic, supra* at 566.]

Thus, similar to *Townsend,* what may be gleaned from *Pavlic* is that, traditionally, commission of a malum in se unlawful act that results in an unintended death is sufficient in itself to constitute manslaughter; whereas an unintended death resulting from either a lawful act or a malum prohibitum unlawful act requires specific proof of a culpable mens rea, which may consist of an intent to inflict bodily injury or of gross negligence showing a reckless disregard for the safety of another.

In a more recent case, *Datema,* this Court again addressed the mens rea necessary to sustain a manslaughter conviction. Citing *Pavlic*, we held that where an act is malum prohibitum unlawful or lawful, a mens rea of "criminal negligence" is required to prove manslaughter, and this requirement is met if the defendant *either* intended to inflict some bodily injury on another *or* if the

23

defendant acted carelessly in such a manner that manifests a reckless disregard for another's life-that is, if the defendant acted with gross negligence. *Datema, supra* at 598-599. "Gross negligence is only necessary if an intent to injure cannot be established." *Id.* at 605.[10]

Regarding malum in se unlawful-act manslaughter, *Datema* first noted that under traditional common law (as expressed in *Townsend* and *Pavlic*), "[w]hen an unintentional killing occurred during the commission of [a malum in se unlawful] act . . , the commission of the underlying malum in se [act] supplied the mens rea for involuntary manslaughter." *Id.* at 599-600. Further, *Datema* noted that "[u]nlike the second and third theories of involuntary manslaughter liability, the [unlawful act] rule does not require negligence." *Id.* at 600.

The defendant in *Datema* argued that, just as *Aaron* held that proof that a defendant committed the underlying felony is no longer sufficient to show malice and thus constitute murder, proof that the defendant committed the

---

[10] Thus, in fact, *Datema* makes clear that it is not the case, as defendants seem to assert, that lawful-act manslaughter *requires* that the prosecutor prove that the defendant acted with "gross negligence." The prosecutor may prove lawful-act manslaughter by demonstrating that the defendant acted with either gross negligence or with an intent to injure.

underlying malum in se unlawful act should no longer "in itself" be sufficient to constitute manslaughter. We declined to address this issue in *Datema* because the unlawful act that the defendant committed, assault and battery, itself showed that the defendant acted with a specific intent to injure and, thus, the defendant acted with a culpable manslaughter mens rea. Thus, *Datema* concluded that the defendant was properly convicted of involuntary manslaughter because "[a]n unlawful act committed with the intent to injure or in a grossly negligent manner that proximately causes death is involuntary manslaughter." *Id.* at 606.

We, too, need not consider whether the prosecutor was *required* in this case to specifically prove that defendants acted with a culpable mens rea or whether proof that defendants committed the malum in se unlawful act itself furnishes a sufficient mens rea for involuntary manslaughter[11] because, in either case, the prosecutor did prove that defendants acted with a culpable mens rea of gross negligence. Pursuant to *Datema,* if the prosecutor

---

[11] We note, however, that were we to hold that the prosecutor was not required to specifically prove a mens rea, defendants would not be entitled to relief on the basis that the prosecutor, in proving a mens rea of gross negligence, proved more than was required.

25

proves that defendants committed "[a]n unlawful act . . . with the intent to injure *or in a grossly negligent manner* that proximately cause[d] death," *id.,* an involuntary manslaughter conviction may be appropriate. Therefore, the prosecutor did not err in proceeding under a gross negligence theory. Moreover, it is apparent that, at the very least, the prosecutor sufficiently proved its case. Defendants may not seek relief on the basis that the prosecutor may have "over-proved" its case by demonstrating that defendants acted with a mens rea of gross negligence.

## IV. CONCLUSION

To summarize, the language in *Ryczek* regarding the commission of an "unlawful act not amounting to a felony" does not mean that a defendant may not be convicted of involuntary manslaughter for an unintentional death resulting from the commission of a felony. Disregarding the reference to an "unlawful act not amounting to a felony," *Ryczek's* description of involuntary manslaughter remains a useful tool in discerning the circumstances under which involuntary manslaughter may occur. However, we emphasize that *Ryczek's* description is just that—a useful tool, and not a definitive statement regarding the elements of involuntary manslaughter. More importantly, it must be kept in mind that "the sole element distinguishing

26

manslaughter and murder is malice," *Mendoza* at 536, and that "[i]nvoluntary manslaughter is a catch-all concept including all manslaughter not characterized as voluntary: 'Every unintentional killing of a human being is involuntary manslaughter if it is neither murder nor voluntary manslaughter nor within the scope of some recognized justification or excuse.'" *Datema, supra* at 594-595. If a homicide is not voluntary manslaughter or excused or justified, it is, generally, either murder or involuntary manslaughter.[12] If the homicide was committed with malice, it is murder.[13] If it was committed with a lesser mens rea of gross negligence or an intent to injure, and not malice, it is not murder, but only involuntary manslaughter.

Defendants in this case purposefully committed a malum in se unlawful act when they poured GHB into Samantha Reid's drink and, in doing so, caused her death. Her death was not voluntary manslaughter or excused or justified.

---

[12] Statutory exceptions to the common-law catch-all crime of manslaughter exist. For instance, see MCL 750.324 and 750.325, regarding the crime of "negligent homicide."

[13] Of course, if a defendant commits murder, he has essentially also committed manslaughter because manslaughter is a necessarily included lesser offense of murder. *Mendoza, supra* at 548.

27

Whether or not defendants acted with malice, the jury found, in either case, that they acted with a diminished mens rea of gross negligence sufficient to sustain a conviction of manslaughter. In short, defendants, by their purposeful, willful, reckless, and unlawful behavior, unintentionally killed another person, and this is exactly the type of homicide that fits within the parameters of involuntary manslaughter. Therefore, we overrule the judgment of the Court of Appeals and reinstate defendant Limmer's conviction of accessory after the fact to involuntary manslaughter and the remaining defendants' involuntary manslaughter convictions.

Stephen J. Markman
Maura D. Corrigan
Elizabeth A. Weaver
Clifford W. Taylor
Robert P. Young, Jr.

28

# S T A T E   O F   M I C H I G A N

## SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellant,

v                                 No. 123553

NICHOLAS E. HOLTSCHLAG,

    Defendant-Appellee.

_____

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellant,

v                                 No. 123554

JOSHUA M. COLE,

    Defendant-Appellee.

_____

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellant,

v                                 No. 123555

DANIEL BRAYMAN,

    Defendant-Appellee.

_____

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellant,

v                                     No. 123556

ERICK LIMMER,

    Defendant-Appellee.

_____

CAVANAGH, J. (*concurring in the result only*).

I concur in the result reached by the majority; however, I write separately because I disagree with the majority's rationale. Unlike the majority, I believe that a defendant can be convicted of involuntary manslaughter when the committed act is a felony, but only when the felony does not naturally tend to cause death or great bodily harm.[1]

The manslaughter statute, MCL 750.321, provides the following: "Any person who shall commit the crime of manslaughter shall be guilty of a felony punishable by imprisonment in the state prison, not more than 15 years or by fine of not more than 7,500 dollars, or both, at the

_____

[1] Although I still believe that "[g]ross negligence should be recognized as the mens rea standard for all common-law forms of involuntary manslaughter," as expressed in my dissent in *People v Datema*, 448 Mich 585, 609; 533 NW2d 272 (1995), this interpretation of the law was not shared by a majority of this Court.

2

discretion of the court."  No distinction is made in the statute between voluntary manslaughter and involuntary manslaughter.[2]

Because the statute at issue, MCL 750.321, does not define manslaughter, the common-law definition must be used.  *People v Townes*, 391 Mich 578, 588; 218 NW2d 136 (1974).  Involuntary manslaughter is defined as "'the killing of another without malice and unintentionally, but in doing some unlawful act not amounting to a felony nor naturally tending to cause death or great bodily harm, or in negligently doing some act lawful in itself, or by the negligent omission to perform a legal duty.'"  *People v Herron*, 464 Mich 593, 604; 628 NW2d 528 (2001), quoting *People v Ryczek*, 224 Mich 106, 110; 194 NW 609 (1923).

I disagree with the majority's claim that this Court did not provide a definition in *Ryczek* but merely offered "guidance" and "a useful tool."  *Ante* at 13, 26.  I find this claim to be disingenuous.  This Court in *Ryczek*, *supra* at 109, stated that the term "involuntary manslaughter" is "well defined" and then went on to provide the definition.  This Court in *Herron*, *supra* at 604, stated that "the

---

[2] "There is but one offense of manslaughter in this State."  *People v Rogulski*, 181 Mich 481, 494; 148 NW 189 (1914).

3

*definition* [of involuntary manslaughter] is left to the common law. . . . This Court has *defined* the common-law offense of involuntary manslaughter as . . . ." (Emphasis added.) Further, in *Townes*, *supra* at 590, this Court similarly stated that in *Ryczek*, "the Court approved the following *definition* of involuntary manslaughter . . . ." (Emphasis added.) While the majority now chooses to characterize the definition as a descriptive tool, I believe it is clear that the *Ryczek* definition is, in fact, a definition.

I believe a proper reading of the definition of involuntary manslaughter dictates that a person cannot be convicted of involuntary manslaughter when he commits a felony that naturally tends to cause death or great bodily harm. If the defendant commits a felony that does not naturally tend to cause death or great bodily harm, such as larceny of an ornamental tree, MCL 750.367, he can be convicted of involuntary manslaughter if death to a person results. This conclusion is consistent with this Court's prior decisions.

This Court has previously rejected the argument that a defendant cannot be convicted of involuntary manslaughter merely because the act committed was a felony. See, e.g., *People v Carter*, 387 Mich 397, 422; 197 NW2d 57 (1972);

4

*People v Pavlic*, 227 Mich 562, 565-567; 199 NW 373 (1924). In *Pavlic*, a man died after drinking liquor sold by the defendant. At the time, selling intoxicating liquor was a felony. This Court stated that violating the liquor law is only criminal because it is prohibited by statute; it is a malum prohibitum act.[3] "It is not inherently criminal. Notwithstanding the fact that the statute has declared it to be a felony it is an act not in itself directly and naturally dangerous to life." *Id.* at 565. The commission of a malum prohibitum act "will constitute manslaughter if performed under such circumstances as to supply the intent to do wrong and inflict some bodily injury." *Id.* at 566. Selling intoxicating liquor was insufficient to support the manslaughter conviction in *Pavlic* because the defendant did not possess an intent to inflict injury or a reckless disregard for the safety of the victim. However, if the circumstances had been different, for example, if the liquor had contained certain poisonous ingredients that the defendant had known about, the defendant would have been guilty of involuntary manslaughter. *Id.* at 567.

---

[3] "An act is malum prohibitum if it is an 'act which is not inherently immoral, but becomes so because its commission is expressly forbidden by positive law . . . .'" *Datema, supra* at 597 n 13, quoting Black's Law Dictionary (6th ed).

My reasoning is consistent with past opinions and orders of this Court, and does not require a finding, as the majority now does, that this Court's order in *People v Rode*, 449 Mich 912 (1995), was impliedly overruled by this Court's opinion in *People v Mendoza*, 468 Mich 527, 534; 664 NW2d 685 (2003). In *Rode*, this Court's order peremptorily reinstated the defendant's convictions of second-degree murder and felony-firearm possession on the basis of the reasoning of the dissenting judge in the Court of Appeals. The dissenting judge argued:

> Because shooting at the other vehicle full of people was "an unlawful act" amounting to "a felony and would naturally tend to cause death or great bodily harm," it was not conduct within the definition of involuntary manslaughter for a killing committed "in doing some unlawful act *not amounting to a felony nor naturally tending to cause death or great bodily harm* . . . ." [*Rode, supra* at 914 (LEVIN, J., dissenting, citing JANSEN, J., concurring in part and dissenting in part, unpublished opinion per curiam, issued March 3, 1995 [Docket No. 179942]).]

In essence, this Court adopted the dissenting judge's statement that shooting at a car full of people is not involuntary manslaughter because that act constitutes a felony that would naturally tend to cause death or great bodily harm. Further, in *Datema, supra* at 597, this Court stated, "where a defendant commits an unlawful act that is malum prohibitum or a lawful act executed negligently that

6

causes death, involuntary manslaughter may be premised on criminal negligence." While this Court was considering the misdemeanor-manslaughter rule in *Datema*, the general principles articulated are relevant to the issue at hand.

Finally, the underlying felony in this case—mixing a harmful substance in a drink—does not naturally tend to cause death or great bodily harm.[4] There are numerous harmful substances that could be mixed into a drink that would not naturally lead to death or great bodily harm. Unfortunately, GHB (gamma hydroxybutrate) was mixed in the girls' drinks in amounts that led to one girl's death, but that does not mean that defendants' underlying felony is one that naturally tends to cause death or great bodily harm.[5] Therefore, I believe that the prosecutor had to

---

[4] MCL 750.436(1) states, in pertinent part, "A person shall not . . . (a) [w]illfully mingle a poison or harmful substance with a food, drink, nonprescription medicine, or pharmaceutical product . . . knowing or having reason to know that the food, drink, nonprescription medicine, pharmaceutical product, or water may be ingested or used by a person to his or her injury."

[5] GHB can have a range of effects from memory loss to death. In low doses, the drug can reduce inhibitions, which is presumably why the drug was mixed in the girls' drinks. See United States Drug Enforcement Administration, <www.dea.gov> (accessed July 7, 2004); Executive Office of the President, Office of National Drug Control Policy, <www.whitehousedrugpolicy.gov> (accessed July 7, 2004).

(continued…)

specifically allege and prove, as he did, that defendants were grossly negligent.

Therefore, while I agree with the result reached by the majority, I disagree with the majority's rationale. Accordingly, I concur in the result only.

                                        Michael F. Cavanagh
                                        Marilyn Kelly

---

(…continued)

I also note that there may certainly be cases in which the act of mixing GHB into a person's drink is proven to be with malice; however, in this case, the prosecutor did not seek to prove malice.