# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

FREDERICK BRYANT BILES,

      Defendant-Appellant.

UNPUBLISHED
May 9, 2017

No. 329916
Wayne Circuit Court
LC No. 15-000598-01-FC

Before: TALBOT, C.J., and K. F. KELLY and BORRELLO, JJ.

PER CURIAM.

Frederick Bryant Biles was convicted by a jury of second-degree murder,[1] assault with intent to murder,[2] and possession of a firearm during the commission of a felony (felony-firearm).[3] He appeals as of right. We reverse Biles's convictions and sentences and remand for a new trial.

It is undisputed that on November 18, 2014, Biles shot Andrew Baker twice—once in the right arm and once in the chest—and that Baker died as a result of the gunshots wounds. Earlier in the evening, Biles learned that Baker was having a heated argument with Biles's daughter, Bryanna Byars, and decided to visit Bryanna's apartment to check on the situation. Biles's son, Brandon Byars, accompanied him. At trial, Biles testified that he was armed at the time because he had a concealed pistol license (CPL) and always carried a gun. It is also undisputed that when Biles and Brandon arrived at the apartment, Brandon began physically fighting with Baker in the bedroom.

The central issue at the trial was the circumstances surrounding the shooting. The prosecution's theory was that Biles intentionally shot Baker out of anger stemming from Baker's fights with Bryanna and Brandon. By contrast, Biles testified that he fired the first shot as a "warning" because Baker had threatened to take his weapon and he saw Baker coming toward

---

[1] MCL 750.317.

[2] MCL 750.83.

[3] MCL 750.227b.

him with an unidentified object in hand.  Biles explained that he aimed the gun toward the wall and did not intend to shoot Baker at all.  After the first shot was fired, Bryanna struggled with Biles over the gun, causing it to accidently discharge a second time.  Bryanna pushed Biles from the apartment after the second shot and Biles left the scene.  The next day, Biles drove to Indiana so he could turn himself in at his Army base.  However, he was confronted by Indiana police officers before he reached the base and surrendered.

Biles raises several claims of error on appeal, including a challenge to the trial court's manner of questioning witnesses during the trial.  According to Biles, the trial court pierced the veil of judicial impartiality by asking questions of various witnesses that conveyed its disbelief of Biles's theory of the case.  Because we find this argument persuasive and dispositive, we will address it first.

"[W]hether judicial misconduct denied defendant a fair trial is a question of constitutional law that this Court reviews de novo."[4]  The Michigan Supreme Court recently described the following principles regarding claims of judicial bias:

> A trial judge's conduct deprives a party of a fair trial if the conduct pierces the veil of judicial impartiality.  A judge's conduct pierces this veil and violates the constitutional guarantee of a fair trial when, considering the totality of the circumstances, it is reasonably likely that the judge's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against a party.  In evaluating the totality of the circumstances, the reviewing court should inquire into a variety of factors including, but not limited to, the nature of the trial judge's conduct, the tone and demeanor of the judge, the scope of the judicial conduct in the context of the length and complexity of the trial and issues therein, the extent to which the judge's conduct was directed at one side more than the other, and the presence of any curative instructions, either at the time of an inappropriate occurrence or at the end of trial.[5]

Biles argues that he was deprived of a fair trial because the trial court's questioning of several witnesses was conducted in a prejudicial manner.  "Judicial misconduct may come in myriad forms, including . . . inappropriate questioning of witnesses . . . ."[6]  Although MRE 614(b) authorizes the trial court to interrogate witnesses, its authority to do so is not without limits.[7]  For example, "[i]t is inappropriate for a judge to exhibit disbelief of a witness,

---

[4] *People v Stevens*, 498 Mich 162, 168; 869 NW2d 233 (2015).

[5] *Id*. at 164.

[6] *Id*. at 172-173.

[7] *Id*. at 173-174.

intentionally or unintentionally," and "[i]t is essential that the judge 'not permit his own views on disputed issues of fact to become apparent to the jury.' "[8]

Here, the trial court frequently questioned witnesses about matters that did not require clarification. It also placed an inordinate emphasis on questions that required damaging statements already described by the witnesses to be repeated. For instance, the Indiana detective who apprehended Biles testified in his direct examination that upon approaching Biles's vehicle, he heard Biles say, "I surrender. I want to turn myself in." As he was being handcuffed, Biles also indicated that he had "screwed up." The detective's testimony was unambiguous, yet the trial court still asked the witness to review his report and repeat the language used by Biles verbatim.

The court's questions to Bryanna's neighbor, Vaniecia Cabbil, were of a similar nature. Cabbil testified that she heard two comments from a male voice before the shooting—"Let me in, let me in. Where he at?" and "Keep your [*******] hands off my daughter"—as well as one comment from a female voice after the shooting: "Daddy, no. Okay, you shot him. We've got to keep him alive, we've got to keep him alive." Again, the majority of the court's questions to Cabbil were focused on these statements:

> *The Court*: Okay. This person who was saying after the shooting, "Daddy, no, daddy, no," had you ever heard that voice before?
>
> * * *
>
> *The Court*: You don't know if you had ever heard that voice before?
>
> *[Cabbil]*: No.
>
> *The Court*: Do you know who the people were that lived across the hall from you?
>
> *[Cabbil]*: I've seen the girl a few times. We never really had conversation. We just kind of spoke, kept it cordial because we was neighbors.
>
> *The Court*: Okay, okay. When you heard the demand, "Let me in, let me in," where was that coming from? Was that coming from downstairs in the entrance to the apartment?
>
> *[Cabbil]*: Yes.
>
> * * *
>
> *The Court*: And you said you heard this person say, "Keep your [*******] hands off my daughter?"

---

[8] *Id*. at 174 (citations omitted).

> [*Cabbil*]:  Yeah.

Moreover, to the extent that some of the court's questions were intended to clarify Cabbil's earlier testimony, it appears that the court was inadvertently leading Cabbil with suggestive questioning.

The court drew further attention to Bryanna's emotional pleas to Biles when it questioned her.  Though Bryanna acknowledged during her direct testimony that she had screamed "No, daddy," loud enough for her neighbors to hear, the court asked,

> *The Court*:  As you were pushing your father, as you were trying to restrain your father, what was he saying?
>
> [*Bryanna*]:  I don't recall.
>
> *The Court*:  What were you saying?
>
> [*Bryanna*]:  "No."
>
> *The Court*:  "No, daddy, no daddy, no daddy," repeatedly?
>
> [*Bryanna*]:  Yes.
>
> *The Court*:  Repeatedly?
>
> [*Bryanna*]:  Yes
>
> *The Court*:  Very loudly.
>
> [*Bryanna*]:  Yes.

Finally, even more concerning than the trial court's unnecessary emphasis of inflammatory statements, is its manner of questioning Biles.  At several points during its interrogation of Biles, the court clearly implied its disbelief of Biles's testimony regarding the circumstances of the shooting:

> *The Court*:  Okay.  When you went over to your daughter's house, you had received this telephone call, but you indicated to us that you had no intention of hurting Mr. Baker; is that right?
>
> [*Biles*]:  That's correct.
>
> *The Court*:  So what you're telling us is that it was mere happenstance, mere unfortunate luck that you struck him twice with bullets from this gun?  Yes or no?
>
> [*Biles*]:  Umm - -
>
> *The Court*:  Yes or no?

*[Biles]*: Yes, I would say that. It wasn't intentional.

* * *

*The Court*: . . . Now you say that you loved this Mr. Baker like a son?

*[Biles]*: That's true.

*The Court*: Okay, but yet you knew you had shot him, and you never stayed in the apartment to make sure that he was given adequate medical assistance; is that right? Yes or no?

*[Biles]*: Yes.

Additionally, while not overtly hostile, the court asked questions that seriously undermined Biles's accident theory. Despite the fact that the prosecution had already explored Biles's weapon safety training, the court emphasized the point by eliciting testimony from Biles regarding his military training and then asking:

*The Court*: . . . This handgun that you had or have, it does have a safety on it, true, you were talking about the button right?

*[Biles]*: Well, not the type of safety that - -

*The Court*: It has a safety, does it not? When the button is in, you're capable of pulling the trigger; when the button is out, you are not, is that true?

*[Biles]*: That's true.[9]

The focus of judicial questioning should be to provide clarity for the trier of fact,[10] and the trial court's inquiries in this case went well beyond what was necessary for that purpose. The trial took place over seven days, only four of which involved presentation of evidence, and the subject matter was not complex or otherwise difficult for the jury to understand. Thus, there was no need for the trial court to consistently question the witnesses regarding these matters. Although not all of the court's inquiries were adversarial, those that were improper were overwhelmingly prejudicial to the defense and beneficial to the prosecution.

---

[9] It is unclear from the record which "button" the trial court was referring to. However, this inquiry may have also mischaracterized the evidence. One of the jurors from Biles's first trial (at which the live testimony was taken and the court's questions asked) submitted a note to the trial court indicating that the slide removal switch on the side of the gun is not a safety mechanism. This is consistent with Biles's earlier testimony that the gun did not have a traditional safety mechanism located on the side of the weapon. Instead, it was equipped with a small lever located in the center of the trigger which must be pulled simultaneously with the trigger itself.

[10] *Id*. at 173.

Admittedly, in the final jury instructions, the trial court explained that its comments and questions were not evidence, nor should they be viewed as an attempt to "influence your vote or express a personal opinion about the case." But while an appropriate curative instruction "weighs against the conclusion that the judge's conduct pierced the veil and deprived defendant of a fair trial," it is equally true that "a single, general instruction may not alleviate substantial judicial bias when judicial questioning of one party is excessive and imbalanced . . . ."[11]

Under the totality of the circumstances, it is reasonably likely that the trial court's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against Biles, thereby depriving Biles of a fair trial. Because the appearance of judicial bias is a structural error, it is not subject to harmless-error analysis.[12] Instead, "[w]hen the issue is preserved and a reviewing court determines that the trial judge's conduct pierced the veil of judicial impartiality, . . . the judgment must be reversed and the case remanded for a new trial."[13]

Because we find that Biles is entitled to a new trial as a result of the appearance of judicial bias, we need not address his remaining claims of error. Nonetheless, we note that Biles correctly argues that several instructional errors occurred at trial. Although none of these errors would warrant reversal, we will address them for the sake of judicial efficiency in the upcoming proceedings.

Although Biles preserved review of the trial court's refusal to instruct the jury regarding involuntary manslaughter and the adverse inference associated with a missing witness by requesting that those instructions be provided,[14] he failed to make a timely objection to the accuracy of the trial court's voluntary manslaughter instruction. As such, that portion of his claim of error is unpreserved. Moreover, there is no error to review when, rather than forfeiting an issue by failing to assert a right in a timely manner, the defendant waives an issue by intentionally relinquishing a known right.[15] By affirmatively indicating his satisfaction with the jury instructions as read, subject only to his previous requests for additional instructions, Biles's trial counsel effectively waived appellate review of Biles's challenge to the voluntary manslaughter instruction.

In reviewing a preserved claim of instruction error, "this Court views the instructions as a whole to determine whether the issues to be tried were adequately presented to the jury."[16] The trial court's decision regarding the applicability of a jury instruction is reviewed for an abuse of discretion, which occurs when the trial court chooses an outcome that "falls outside the range of

---

[11] *Id.* at 190.

[12] *Id.* at 178-179.

[13] *Id.* at 164.

[14] *People v Sabin (On Second Remand)*, 242 Mich App 656, 657; 620 NW2d 19 (2000).

[15] *People v Dobek*, 274 Mich App 58, 65; 732 NW2d 546 (2007).

[16] *People v Armstrong*, 305 Mich App 230, 239; 851 NW2d 856 (2014).

principled outcomes."[17] To the extent that this issue is unpreserved, this Court's review is limited to plain error affecting a party's substantial rights.[18]

Biles argues that the trial court should have issued a missing witness instruction pursuant to M Crim JI 5.12[19] because the prosecution failed to exercise due diligence to secure Brandon's presence at the second trial. In *People v Eccles*,[20] this Court described the following principles regarding the prosecution's obligation to secure the presence of witnesses at trial:

> A prosecutor who endorses a witness under MCL 767.40a(3) is obliged to exercise due diligence to produce that witness at trial. A prosecutor who fails to produce an endorsed witness may show that the witness could not be produced despite the exercise of due diligence. If the trial court finds a lack of due diligence, the jury should be instructed that it may infer that the missing witness's testimony would have been unfavorable to the prosecution's case.[21]

Here, the trial court determined that the prosecution and police failed to exercise due diligence to ensure that Brandon was present at the second trial,[22] and this ruling is not challenged on appeal. However, the trial court declined to instruct the jury that it could infer that Brandon's testimony would have been unfavorable to the prosecution, reasoning that the instruction was inappropriate because the prosecution had exercised due diligence to produce Brandon at the first trial. The trial court abused its discretion by rejecting Biles's request for a missing witness instruction on this basis. There is no authority for the notion that the prosecution's failure to make reasonable efforts to secure a witness's presence at trial is somehow excused merely because that witness testified in an earlier proceeding. Moreover, such a result would be ill advised, as it would allow the prosecution to limit the introduction of damaging testimony at a subsequent trial by foregoing any attempt to locate potentially adverse witnesses. Indeed, it seems that the availability of M Crim JI 5.12 in the absence of a showing of due diligence was designed to avoid just such a result.

Biles also argues that the trial court erred by refusing to instruct the jury regarding involuntary manslaughter. A defendant charged with murder is entitled to have the jury

---

[17] *Id.*

[18] *People v Jackson (On Reconsideration)*, 313 Mich App 409, 421; 884 NW2d 297 (2015).

[19] The requested jury instruction provides: "[State name of witness] is a missing witness whose appearance was the responsibility of the prosecution. You may infer that this witness's testimony would have been unfavorable to the prosecution's case." M Crim JI 5.12.

[20] *People v Eccles*, 260 Mich App 379; 677 NW2d 76 (2004).

[21] *Id.* at 388 (citations omitted).

[22] Biles's first trial ended in a mistrial when the jury was unable to reach a unanimous verdict. Several witnesses from the first trial failed to appear at the second trial, including Brandon.

instructed regarding involuntary manslaughter if supported by a rational view of the evidence.[23] "Every unintentional killing of a human being is involuntary manslaughter if it is neither murder nor voluntary manslaughter nor within the scope of some recognized justification or excuse."[24] The distinguishing element between involuntary manslaughter and murder is malice, which is defined as "an intent to kill, an intent to commit great bodily harm, or an intent to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result."[25] Thus, if the homicide was committed "with a lesser mens rea of gross negligence or an intent to injure, and not malice, it is not murder, but only involuntary manslaughter."[26] In light of Biles's testimony that he did not intend to shoot Baker, the prosecution concedes, and we agree, that a rationale view of the evidence supported Biles's request. Hence, the trial court erred by refusing to instruct the jury regarding involuntary manslaughter as a lesser included offense of second-degree murder.

Next, Biles contends that the trial court erred by providing an inaccurate instruction regarding voluntary manslaughter as a lesser included offense of second-degree murder. It is clear that the instruction read to the jury was flawed—the trial court advised the jury that it could find Biles guilty of the lesser included offense, but then repeated the elements of second-degree murder as the proofs required for voluntary manslaughter. It appears that this error was the result of an oversight in preparing the jury instructions, rather than a true misunderstanding regarding the appropriate instruction. Should the trial court determine that a voluntary manslaughter instruction remains appropriate at the next trial, this oversight should be corrected.

Reversed and remanded for a new trial. We do not retain jurisdiction.

/s/ Michael J. Talbot
/s/ Kirsten Frank Kelly
/s/ Stephen L. Borrello

---

[23] *People v Gillis*, 474 Mich 105, 137; 712 NW2d 419 (2006).

[24] *People v Datema*, 448 Mich 585, 594-595; 533 NW2d 272 (1995).

[25] *Gillis*, 474 Mich at 138, quoting *People v Mendoza*, 468 Mich 527, 540; 664 NW2d 685 (2003).

[26] *Gillis*, 474 Mich at 138, quoting *People v Holtschlag*, 471 Mich 1, 21-22; 684 NW2d 730 (2004).