*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

DOMINIK LOU CHARLESTON,

      Defendant-Appellant,

UNPUBLISHED
March 5, 2019

No. 339923
Wayne Circuit Court
LC No. 17-002247-01-FC

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

KOBI AUSTIN TAYLOR,

      Defendant-Appellant.

No. 340027
Wayne Circuit Court
LC No. 17-002247-02-FC

Before: CAVANAGH, P.J., and SERVITTO and CAMERON, JJ.

PER CURIAM.

In Docket No. 339923, defendant, Dominik Lou Charleston, appeals as of right his jury trial convictions of two counts of first-degree premeditated murder, MCL 750.316(1)(a); two counts of first-degree felony murder, MCL 750.316(1)(b); two counts of armed robbery, MCL 750.529; and one count of felony firearm, MCL 750.227b. The trial court sentenced defendant to life imprisonment for the first degree felony murder convictions[1], 18 to 40 years' imprisonment on the armed robbery convictions and a consecutive two years' imprisonment for

---

[1] Defendant's initial sentences for the first-degree premeditated murder convictions were vacated.

the felony firearm conviction. In Docket No. 340027, defendant, Kobi Austin Taylor, appeals as of right his jury trial convictions of two counts of second-degree murder, MCL 750.317; two counts of armed robbery, MCL 750.529; and one count of felony firearm, MCL 750.227b. The trial court sentenced defendant, departing substantially upward from the sentencing guidelines, to 65 to 95 years' imprisonment for each of the second-degree murder convictions, 18 to 40 years' imprisonment for each of the armed robbery convictions, and a consecutive two years' imprisonment on the felony firearm conviction. We consolidated these matters on appeal. In Docket No. 339923, we affirm. In Docket No. 340027, we affirm defendant's convictions but remand for resentencing in accordance with this opinion.

In the early morning hours of February 6, 2017, defendants, along with Amber Tackett[2], intended to rob 19-year-old Jordan Baker of a quantity of marijuana that Baker had agreed to sell to defendants. During the intended robbery, defendant Charleston shot and killed Baker and another man present, Howard Wick. Defendants were charged and, after a joint jury trial with separate juries, convicted, as indicated above.

<u>Docket No. 339923</u>

On appeal, defendant Charleston contends that the trial court abused its discretion in refusing to provide a self-defense instruction to the jury, thereby violating his constitutional due process right to present a defense. We disagree.

We review de novo claims of instructional error, considering the instructions as a whole to determine whether any error occurred. *People v Traver*, 502 Mich 23, 31; 917 NW2d 260 (2018). A trial court's determination that a jury instruction is applicable to the case is reviewed for an abuse of discretion. *Hill v Hoig*, 258 Mich App 538, 540; 672 NW2d 531 (2003). "An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes." *People v Guajardo*, 300 Mich App 26, 34; 832 NW2d 409 (2013).

A court must properly instruct the jury, including informing them of all elements of the crime charged, all material issues, defenses or theories if there is evidence to support them, so that it may correctly and intelligently decide the case. *Traver*, 502 Mich at 31. Nevertheless, a verdict is not to be set aside and a new trial is not to be granted based on improper jury instruction unless the improper instruction resulted in a miscarriage of justice. MCL 769.26.

In some instances, an individual who has engaged in deadly force has the legal right to use such force. For example, MCL 780.791(1) provides:

An individual who has not or is not engaged in the commission of a crime at the time he or she uses deadly force may use deadly force against another

---

[2] Tackett was charged with respect to the incident, but tendered a plea in the matter. She is not a part of this appeal.

individual anywhere he or she has the legal right to be with no duty to retreat if either of the following applies:

(a) The individual honestly and reasonably believes that the use of deadly force is necessary to prevent the imminent death of or imminent great bodily harm to himself or herself or to another individual.

(b) The individual honestly and reasonably believes that the use of deadly force is necessary to prevent the imminent sexual assault of himself or herself or of another individual.

Pursuant to MCL 780.791(1), then, Charleston could claim self-defense if he engaged in deadly force against Wick and Baker and if (1) he was not engaged in the commission of a crime; (2) he had a legal right to be where he was and had no duty to retreat, and; (3) he honestly and reasonably believed the use of deadly force was necessary to prevent the imminent death of or imminent great bodily harm to himself or to another.

MCL 780.794 further provides that "[t]his act does not diminish an individual's right to use deadly force or force other than deadly force in self-defense or defense of another individual as provided by the common law of this state in existence on October 1, 2006." At common law, self-defense justified the killing of another person if the defendant "honestly and reasonably believes his life is in imminent danger or that there is a threat of serious bodily harm and that it is necessary to exercise deadly force to prevent such harm to himself." *Guajardo*, 300 Mich App at 35 (citations omitted). A defendant generally does not act in justifiable self-defense when he uses excessive force or when he is the initial aggressor. *Id*. At common law, then, Charleston could use self-defense to justify killing Wick and Jordan if he honestly and reasonably believed his life was in imminent danger or that there was a threat of serious bodily harm and it was necessary for Charleston to exercise deadly force to prevent this harm to himself. He could not be found to act in justifiable defense, however, if he used excessive force or if he was the initial aggressor. There were no facts in evidence that would support a self-defense instruction under either MCL 780.791(1) or the common law.

First, there is no evidence that Wick or Baker possessed a gun or weapon at the time either was shot. A witness at trial, Tackett, however, testified that Charleston made her aware when the two of them were on their way to pick up defendant Taylor that he had a gun. Tackett testified that she was also aware that they were going to rob someone. Tackett further testified that when Wick arrived at the location where he was shot, purportedly with the marijuana, Charleston and Taylor had Baker pat Wick down and it did not appear to Tackett that Wick had any weapons. In addition, Charleston wrote in his police statement that he and Taylor intended to rob Baker and Wick. Based on the evidence, Charleston was engaged in the criminal act of attempting to rob Wick and Jordan at the time he shot them. Because a statutory right to self-defense pursuant to MCL 780.791(1) is only available to those not engaged in criminal action at the time they used deadly force, Charleston could not claim self-defense under the applicable statute.

Next, Sergeant Farrar testified that, after waiving his *Miranda* rights, Charleston made a written statement to police. In his written statement, Charleston wrote that when Wick arrived at

the location with the marijuana, he and Taylor got out of the car and Charleston pointed a gun at Wick. While Charleston's statement that he wanted Wick patted down before he exited the car may indicate that Charleston was concerned that Wick may have been armed, there was nothing in the record to confirm that Wick was, in fact, armed. Charleston admitted in his statement that as soon as he got out of the car, he pointed a gun at Wick. Charleston further wrote that he did not know if Wick was reaching for a gun or going for cover when he pointed a gun at Wick, so Charleston shot twice. Based on Charleston's own statement, he had no honest and reasonable belief that his life was in imminent danger or that there was a threat of serious bodily harm and it was necessary for Charleston to exercise deadly force to prevent this harm to himself when he shot Wick. He did not state that Wick came toward him or did pull out a weapon. Instead, he was unsure if Wick was going for a gun or was going for cover. And again, Charleston wrote that he pointed a gun at Wick as soon as he exited the car and shot twice when Wick moved— Charleston did not wait to see if Wick acted in an aggressive manner or pulled out a weapon in return. Notably, medical examiner Lokman Sung testified that Wick's cause of death was a gunshot that entered his back and exited his body through his chest. This suggests that Wick was going for cover, away from Charleston, rather than advancing toward him or attempting to attack Charleston in any way. Because Charleston was the initial aggressor, used excessive force, and had no honest and reasonable belief that his life was in imminent danger, he did not act in justifiable self-defense under the common law when he shot Wick.

Charleston also wrote in his police statement that Baker jumped on top of Charleston after he shot Wick, so Charleston tried pushing Baker off and accidentally shot him. If the shooting of Baker was accidental, as stated by Charleston, a self-defense instruction would be inappropriate. In addition, Dr. Sung testified that Baker's cause of death was a single through-and-through gunshot wound that entered the back of his neck and exited through his right cheek. This indicates that Jordan, too, was not facing or advancing toward Charleston to attack him. Thus, Charleston had no honest and reasonable belief that his life was in imminent danger and, there being no evidence or assertion that Baker was armed, Charleston used excessive force in shooting him.

In sum, there was no evidence at trial that would support a self-defense instruction. The trial court did not abuse its discretion in declining to give the instruction, the jury was not improperly instructed, and no miscarriage of justice resulted from any purported mis-instruction.

Affirmed.

Docket No. 340027

Defendant Taylor first contends on appeal that the trial court erred in denying his request for a jury instruction on manslaughter.[3] We disagree.

"Manslaughter is the unlawful and felonious killing of another without malice, either express or implied." *People v Holtschlag*, 471 Mich 1, 6; 684 NW2d 730 (2004). Common-law

---

[3] Taylor was convicted of second-degree murder on an aiding and abetting theory.

voluntary manslaughter is defined as an act of killing that, while intentional, is committed "under the influence of passion or in heat of blood, produced by an adequate or reasonable provocation," and "before a reasonable time has elapsed for the blood to cool and reason to resume its habitual control." *People v Mendoza*, 468 Mich 527, 535; 664 NW2d 685 (2003) (quotation omitted). Provocation is not an element of voluntary manslaughter; instead, it acts to negate the presence of malice. *Id*. at 536. "The provocation necessary to mitigate a homicide from murder to manslaughter is that which causes the defendant to act out of passion rather than reason." *People v Sullivan*, 231 Mich App 510, 518; 586 NW2d 578 (1998). The provocation standard is an objective one, and must be that which would cause a reasonable person to lose control. *Id.*

The evidence introduced at trial was that Charleston and Taylor met with Wick and Baker with the express intent of robbing them. Charleston was engaged in the crime of robbery and, by his own admission, pointed a gun at Wick upon immediate exit from the car, presumably to accomplish the robbery. Thus, it was Charleston's actions that prompted any responding movement on Wick's part. In Charleston's written statement, he indicated that he was unsure if Wick was moving for a gun or moving for cover, so he shot twice. Charleston was not even sure if Wick had a weapon. He did not see him with one, nor did anyone else. Charleston also wrote that he accidentally shot Baker during a struggle with him.

Charleston was clearly and admittedly the aggressor and brought deadly force to an otherwise non-deadly situation. It is not as though Charleston "lost control" due to some emotional response or due to Wick somehow provoking Charleston. Instead, Charleston acted purposefully, shooting at Wick presumably because he wanted to make sure that if Wick was reaching for a weapon of some kind, he killed him before Wick obtained the non-existing weapon. As a matter of law, no reasonable jury could find that Charleston was adequately provoked into shooting either Wick or Jordan. See, *People v Tierney*, 266 Mich App 687, 715; 703 NW2d 204 (2005). Thus, Taylor was not entitled to a manslaughter instruction.

Taylor next contends that he was denied the effective assistance of counsel due to his trial counsel's failure to move to suppress Taylor's statements made to police during a custodial interrogation prior to his being given his *Miranda*[4] rights. We disagree.

Defendant did not move for a new trial on this basis, nor did he move for a *Ginther*[5] hearing. This Court thus reviews Taylor's claim of ineffective assistance of counsel for "mistakes apparent on the record." *People v Petri*, 279 Mich App 407, 410; 760 NW2d 882 (2008).

To establish ineffective assistance of counsel, a defendant must show (1) that trial counsel's performance was objectively deficient, and (2) that the deficiencies prejudiced the defendant. *People v Randolph*, 502 Mich 1, 9; 917 NW2d 249 (2018). Prejudice means a reasonable probability (a probability sufficient to undermine confidence in the outcome) that, but

---

[4] *Miranda v Arizona*, 384 US 436, 444–445, 477–479; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

[5] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

for counsel's unprofessional errors, the result of the proceeding would have been different. *Id*. Counsel may decide, for strategic reasons, not to object to an obvious error and if that strategy is reasonable, then his or her performance was not deficient. *Id*.

In order to protect the right against self-incrimination under the Fifth Amendment of the United States Constitution, an accused must be given a series of warnings before being subjected to a custodial interrogation. *People v Tanner*, 496 Mich 199, 207; 853 NW2d 653 (2014), citing *Miranda v Arizona*, 384 US 436, 444–445, 477–479; 86 S Ct 1602; 16 L Ed 2d 694 (1966). "Statements of an accused made during custodial interrogation are inadmissible unless the accused voluntarily, knowingly, and intelligently waived his or her Fifth Amendment rights." *People v Henry (After Remand)*, 305 Mich App 127, 144; 854 NW2d 114 (2014) (quotation marks omitted), citing *Miranda*, 384 US at 444.

Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 US at 444. "Custodial interrogation occurs 'during incommunicado interrogation of individuals in a police-dominated atmosphere.' That atmosphere is said to generate 'inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.' " *People v Elliott*, 494 Mich 292, 305; 833 NW2d 284 (2013).

Notably, the prosecution does not contend that Taylor's challenged statements were not made during a custodial interrogation. In our review of the interrogation video, the fact that this was a custodial interrogation is clear. The issue is, then, whether defense counsel's failure to attempt to suppress the statements Taylor made before he was read his *Miranda* rights was, as the prosecution claims, sound trial strategy. We find that it was not.

Taylor's interrogation was played for the jury. The interrogation began on February 6, 2017, at 4:27 p.m. The police told Taylor they wanted to talk to him because they were told that one of the victims, Baker, was with Taylor the prior night. Taylor initially denied that he was with Baker, stating that he had not seen or talked to Baker in about three weeks, and provided a story of his whereabouts the prior night. At 5:17 p.m., one of the officers told Taylor that they knew he talked to Baker the prior night because they have messages between the two from Taylor's Facebook messenger account. The police showed Taylor a printout of the messages and also told Taylor that Baker sent his father a message saying he was going to be with Taylor and that Baker's father further told them that when Baker left the house the prior night, he was with Taylor. Taylor denied sending the messages and says he believes his cousin "John" used his Facebook account to message Baker.

At 6:33 p.m., Taylor told the police that John asked him about getting some marijuana and that Taylor contacted Baker about it. At 6:44 p.m., Taylor acknowledged sending the Facebook messages to Baker trying to get marijuana for John. When asked what time John asked about the marijuana, Taylor told the police "that shit went down around 3:00 [a.m.]," so he thought John spoke to him around 1:00 a.m. One of the officers then asked Taylor how he knew "it went down" around 3:00 a.m., since they did not tell him the time of the incident. At 6:59 p.m., Taylor told the police that John contacted him on Instagram after everything happened and told him what happened. Taylor then provided police another story about where he was and who

he was with the prior evening. At 7:22 p.m., an officer told Taylor that, during their conversation, they received other information, and when they questioned Taylor about it, he "kind of lied" about some things. The officer told Taylor that "before we go any further I am going to read you your rights" because Taylor made some statements about a drug deal, even though he was not a part of the deal. Taylor also told the officer that he may have been part of an attempted drug robbery last summer. Taylor was then read his rights.

During the nearly three hours of questioning before he was read his rights, Taylor implicated himself in a possible prior attempted drug robbery and also placed himself at the scene of this crime by admitting that he contacted Baker to set up a drug deal and stating that "this shit went down around 3:00 a.m." when the police had not told him what time the murders occurred. Taylor also gave several different stories about where he was the prior night and who he was with. Throughout these three hours of questioning, the police continually told Taylor he was lying to them, and pointed out when they felt he was not being truthful. There would be no reasonable trial strategy in allowing the jury to view the videotaped interview before Taylor was given his *Miranda* rights. As was pointed out by the police multiple times during the interview, Taylor appeared to be continually lying and thus not trustworthy. If only Taylor's post-*Miranda* statement was admitted, the jury may have been more likely to believe Taylor's statement to police.

Nevertheless, we cannot conclusively find that, but for trial counsel's deficient performance, there is a reasonable probability that the outcome of the trial would have been different. While the admission of the pre-*Miranda* statements affected Taylor's credibility, Taylor always maintained, even after his rights were read, that he had no idea a robbery was going to take place.

Moreover, there was an overwhelming amount of testimony to convict Taylor. Rex Pierson testified at trial that, several hours prior to the incident at issue, Taylor was at Pierson's home and invited people over to smoke marijuana. Pierson testified that Taylor said he was thinking about just robbing Baker, but Pierson told Taylor that he was not robbing someone at Pierson's house. Tackett testified that her, Charleston's, and Taylor's intent that night was to smoke marijuana and rob someone. Tackett further testified that Taylor got out of the car with Charleston when they met with Baker and Wick, and that after Charleston shot the victims, Charleston told Taylor to "go get it." According to Tackett, Taylor then got out of the car and went toward Wick, who had collapsed. Tackett saw Taylor pat Wick down on the ground, trying to find something. Taylor told Charleston he could not find it and Taylor ran back to the car where Tackett and Charleston were waiting. Even without the challenged statements, then, the jury could have convicted Taylor. As much as defense counsel's performance was deficient, we conclude that Taylor was not denied the effective assistance of counsel.

Taylor next asserts that the trial court abused its discretion in imposing a sentence upon him that unreasonably exceeded the guidelines minimum sentence range. We review a trial court's imposition of a sentence that departs from the guidelines range for an abuse of discretion. *People v Lockridge*, 498 Mich 358, 392; 870 NW2d 502 (2015). We review unpreserved issues, such as this, for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 764; 597 NW2d 130 (1999).

-7-

A sentence is unreasonable—and thus an abuse of the trial court's discretion—if the trial court failed to adhere to the principle of proportionality in imposing its sentence on a defendant. *People v Steanhouse*, 500 Mich 453, 477; 902 NW2d 327 (2017), citing *People v Milbourn*, 435 Mich 630, 636; 461 NW2d 1 (1990). The "principle of proportionality requires sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender." *Steanhouse*, 500 Mich at 474. Factors to consider when determining the proportionality of an upward departure "include (1) whether the guidelines accurately reflect the seriousness of the crime, (2) factors not considered by the guidelines, and (3) factors considered by the guidelines but given inadequate weight." *People v Dixon-Bey*, 321 Mich App 490, 525; 909 NW2d 458 (2017) (citations omitted). The trial court must justify an upward departure to facilitate appellate review. *Lockridge*, 498 Mich at 392.

Taylor's sentencing guidelines in this matter were 22½ to 37½ years' imprisonment. At his sentencing on July 12, 2017, defense counsel asked the trial court to sentence Taylor between 25 and 30 years. The prosecution asked that he be sentenced to "the maximum allowable." There was no specific sentence recommendation in Taylor's presentence investigation report (PSIR). The trial court sentenced Taylor to 65 to 95 years—a significant upward departure.

In imposing the sentence, the trial court stated that Taylor was the mastermind behind everything, setting the wheels in motion. The court stated that the guidelines were woefully inadequate to address the role that Taylor played. The court noted that, throughout trial and even at sentencing, Taylor appeared to treat the matter like it was a joke. The trial court also stated that the guidelines failed to take into account the *generational* impact that occurred when Baker died. The trial court indicated that while the guidelines take into account the *emotional* impact the homicides had on Baker's and Wick's families, Baker was an only child, thereby depriving his parents the ability to have grandchildren and ending their legacy.

The trial court further stated that after Wick had been shot, Taylor got out of the car and flipped Wick's body over to search for the marijuana. The trail court further stated that, while talking to police, Taylor tried implicating other people who had nothing to do with the matter, and that the police were getting warrants ready for those uninvolved people when Taylor finally told the truth. The trial court did not feel that Taylor could be rehabilitated and that there was nothing that could happen in prison other than to make "him a worse monster than the one he already is." Thus, the trial court indicated that it was departing from the guidelines range due to Taylor's lack of remorse and personal responsibility, his role as the mastermind, his lack of ability to be rehabilitated, and the fact that he initially tried framing other people for the crimes.

Taylor was convicted of second-degree murder on an aiding and abetting theory while his co-defendant, the one who brought a gun to the incident and shot the victims, was convicted of first degree premeditated and first-degree felony murder and sentenced to mandatory life without parole. The reasons given by the trial court for departing from the sentencing guidelines in Taylor's case were factors either not considered by the guidelines or factors considered by the guidelines but given inadequate weight and concerned the nature of the offense. However, the trial court did not specifically address 19-year-old Taylor's background or how the sentence imposed was more proportionate to him, which is the basis of the proportionality requirement.

"Under the principle of proportionality, the trial court must take into account the nature of the offense and the background of the offender to assure that the sentence imposed is proportionate to the seriousness of the matter." *Steanhouse*, 500 Mich at 472 (quotation marks and citations omitted). A trial court's justification of the sentence imposed must include "an explanation of why the sentence imposed is more proportionate to the offense and the offender than a different sentence would have been." *Dixon-Bey*, 321 Mich App at 525.

A cursory review of Taylor's PSIR indicates that Taylor's background likely plays a significant role in who he is and his behaviors. Taylor's PSIR indicates that he had not lived at home since he was 17. He is listed as homeless. The PSIR also indicates that Taylor had not had the presence of a male father figure in his life since he was 11 years old.

More importantly, Taylor's PSIR also indicates that he had only a 9th grade education, with Taylor having been in special education classes since second or third grade. Taylor was diagnosed with ADHD when he was five years old and placed on medication, but has not taken his medication since he was 16 years old. Defendant's mother stated that defendant was also considered emotionally and cognitively impaired and attended Adult Education and a day school due to behavioral problems. Taylor apparently received disability benefits from ages 5 to 18 for a learning disability.

It is additionally indicated that Taylor has a psychiatric history. A note in his juvenile record states that "Youth has significant mental health needs . . . . The Court on the order following probation review hearing believed the youth has exhausted juvenile services and that this is mainly a mental health case."

The trial court made no reference to Taylor's background at all, leaving an implication that it did not take into account the background of the offender as it is required to do when departing upward from the sentencing guidelines. *Steanhouse*, 500 Mich at 472 (quotation marks and citations omitted). The trial court also did not justify *why* this specific, significant upward departure (22½ to 37½ years recommended versus 65 to 95 years imposed) is more proportionate to the offense and the offender than a different sentence would have been. *Dixon-Bey*, 321 Mich App at 525. We therefore remand for resentencing to allow the trial court to take Taylor's background into account and explain why the sentence imposed was more proportionate to Taylor than that indicated in his sentencing guidelines.

Affirmed, but remanded for resentencing in accordance with this opinion. We do not retain jurisdiction.

/s/ Mark J. Cavanagh
/s/ Deborah A. Servitto
/s/ Thomas C. Cameron