*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

COLBY ANTHONY SKIPPERGOSH,

Defendant-Appellant.

FOR PUBLICATION
October 28, 2024
12:47 PM

No. 364127
Emmet Circuit Court
LC No. 2022-005320-FH

Before: RIORDAN, P.J., and YOUNG and WALLACE, JJ.

YOUNG, J.

Defendant-Appellant, Colby Skippergosh, appeals as of right his convictions and sentence for domestic violence, third offense, MCL 750.81(5); and child abuse in the fourth degree, MCL 750.136b(7). Skippergosh was acquitted of attempted assault by strangulation, MCL 750.84(1)(b), MCL 750.92. He was sentenced as a fourth-offense habitual offender, MCL 769.12, to serve concurrent terms of 55 months to 25 years in prison for the domestic-violence conviction and 365 days for the child-abuse conviction, with credit for 346 days served. For the reasons set forth, we affirm his convictions and remand for resentencing.

## I. FACTUAL BACKGROUND

On December 17, 2021, W.F. called her brother, Byron Francis, using a video chat function. At the time, W.F. was at home with Skippergosh (W.F.'s live-in boyfriend) and their infant child. Francis and his wife, Ivana Castillo, believed W.F. was intoxicated from alcohol at the time, and they were concerned about the infant child. They decided to drive from their home in Mount Pleasant to Petoskey, where W.F. was living at the time.

Castillo explained that they decided to do so because "when we were on the video chats, she was showing us her furniture, and her and [Skippergosh] got into an altercation. He did like hit her, and then he pushed her on the couch, like this." At about the same time, Castillo observed Skippergosh grab W.F. in the "neck area." Castillo added that part of the reason for going to Petoskey was to secure "the baby," given that W.F. told Skippergosh at one point that "You dropped the baby. Oh my God, you dropped the baby." Castillo was concerned that neither W.F.

-1-

nor Skippergosh should have been holding their baby at the time, as they were both intoxicated. While on the drive to Petoskey, Castillo contacted local police.

Castillo's child, who was 13-years-old at the time of trial, testified that she observed Skippergosh "hit" W.F. with a closed fist on the video chat on the day in question. She also "heard a thud" at one point, which was immediately followed by W.F. yelling, "He dropped my baby." Robert Wonegeshik, W.F.'s father, briefly testified that he received a "video call" from W.F. on December 17, 2021, during which W.F. "looked pretty bruised up." That day, he sent a text message to Francis asking whether Francis contacted the police.

Francis testified that on the day in question, he observed Skippergosh on the video chat "grab[]" W.F. "by her neck" with one hand. Francis also heard a noise at one point that was immediately followed by W.F. saying, "He dropped my baby." During the drive to Petoskey, Francis occasionally observed "their argument continue" on the video chats, but he could not closely pay attention because he was driving the car. Francis said that when he arrived at W.F.'s apartment in Petoskey, the police were already there investigating the incident, and he and Castillo brought the baby to the hospital. Both W.F. and Skippergosh appeared to be heavily intoxicated at the time.

Officer Lawrence Donovan was one of the arriving officers at the scene of the reported domestic violence. He would later testify that W.F. appeared to be intoxicated and "began pleading with me, asking me to not make this about him." Officer Donovan described W.F. as a "very uncooperative victim." Skippergosh was subsequently arrested, and the preliminary breath test at the county jail indicated a blood alcohol level of .249.

Charges related to this domestic incident were filed against Skippergosh as noted above, and at trial, the prosecution filed its MCL 768.27b notice, seeking to admit evidence of a previous domestic violence incident between W.F. and Skippergosh. The prosecution described that earlier event as:

> On January 17, 2020, Defendant's girlfriend, [W.F.], knocked on the front door of her neighbors, Brian Carver and Heidi Brege. [W.F.'s] face was covered in blood and swollen. [W.F.] told Mr. Carver and Ms. Brege that she and Defendant got into an argument regarding alcohol and money. [W.F.] said that Defendant dragged her out of the house and kicked her in the ribs as she lay on the ground. [W.F.] said "it's okay, he will say he's sorry tomorrow." [W.F.] said that Defendant has done worse things in the past, such as stabbing her in the back of the head. [W.F.] had a substantial laceration above her right eye and was taken to the hospital. Defendant was charged with Domestic Violence – 3rd Offense, however that charged [sic] was dismissed after a preliminary examination, and Defendant pled guilty to a separate charge. . . .

The prosecution also sought to admit evidence of another act of domestic violence committed by Skippergosh against a different girlfriend, M.O., in July 2020.[1]

The following month, Skippergosh moved, through his first-appointed counsel, to exclude evidence of the prior acts of domestic violence, reasoning that it was not relevant under MRE 401 and that it was unduly prejudicial under MRE 403. Skippergosh added that the evidence was only provable by inadmissible hearsay. In September 2022, Skippergosh's newly appointed counsel[2] filed a similar motion in limine to exclude evidence of Skippergosh's prior acts of domestic violence. In the motion and accompanying brief, Skippergosh similarly argued that Brian Carver and his then-girlfriend Heidi Brege could not testify about the January 2020 domestic-violence incident because their testimony was inadmissible hearsay. In addition, Skippergosh argued that evidence of the acts of domestic violence was inadmissible under MRE 403. The prosecution, in its response brief, argued that testimony by Carver and Brege was admissible through MRE 803(2), the excited-utterance exception.

Brege and Carver both testified at trial. Brege testified that one evening in January 2020, when she was living near W.F. and Skippergosh, she and Carver, "hung out" at the house occupied by W.F. and Skippergosh. Specifically, the four of them watched television and consumed alcohol for about 30 to 60 minutes. Brege and Carver then went to a bar by themselves. Later that night, Brege awoke to a knock on the door at about 3:00 a.m. Brege continued:

> A: [I] went to go answer it, and at first nobody was there.
>
> Q: Okay.
>
> A: So I went back to bed; and then it happened again, probably like ten minutes later.
>
> Q: Okay.
>
> A: And this time I ran to the door, and [W.F.] was on my bench outside, slumped over, with a gash on her head.
>
> Q: Was she – did you see any blood on her or any other injuries at that point?

---

[1] Ultimately, while the trial court ruled before trial that evidence of domestic violence against M.O. was admissible, no such evidence was offered at trial.

[2] In March 2022, the trial court granted Skippergosh's request for new appointed counsel because of a breakdown in the attorney-client relationship with his original trial counsel. In essence, Skippergosh informed the trial court at a March 2022 motion hearing that he had not received appropriate discovery from the prosecution's office, and that his original trial counsel was lying when indicating otherwise. The prosecution informed the trial court that it did provide appropriate discovery, and the trial court specifically found on the record that appropriate discovery had been provided.

A: Yes. She had a big gash on the side. I believe her – blood all in her hair. She wasn't wearing shoes. She looked pretty rough.

\* \* \*

Q: What was her emotional state like?

A: She was slumped over, so I brought her inside. You could tell she was kind of shaken.

Q: Okay.

A: The wind had caught the door, and it made her jump.

Q: It made her what?

A: Jump.

Q: Okay. Did she say anything right at that point when she jumped?

A: She didn't say anything, no. She just jumped.

Q: She appeared scared to you?

A: Yes.

Brege explained that W.F. appeared to be intoxicated, and "[s]he said that she had been kicked in the ribs. She didn't go into too much detail. It seemed like she was kind of scared." W.F. told Brege that " 'he' kicked her," and Brege inferred that "he" referred to Skippergosh because "they were the only ones there." In addition, W.F. told Brege that "they had been fighting over alcohol and money and who was going to pay for it." Carver called the police, and W.F. responded by hiding in the bathroom when the police arrived. W.F. was eventually taken away by ambulance.[3]

Officer Brock Kimball testified that he assisted with executing a search warrant of Skippergosh's and W.F.'s residence in January 2020 to investigate the suspected domestic violence admitted as other acts evidence. He photographed multiple areas of suspected blood within the residence, such as "a smear of blood, on the corner of the stove." Officer Kimball collected samples from one of the apparent blood stains for testing, but he did not do so for the remaining stains. He explained that it was "not typical" to collect samples from every apparent blood stain at a crime scene. An MSP forensic scientist testified that the sample collected by Officer Kimball indicated the presence of W.F.'s DNA.

W.F. was called to testify by the prosecution. W.F. testified that she had a poor relationship with Francis and Castillo, and no relationship with Castillo's child. She said that she had a "good" relationship with her father, although the two of them did not communicate frequently. W.F.

---

[3] W.F. was not cooperative with the police investigation.

denied being assaulted by Skippergosh on the day in question in December 2021. She speculated that Francis lied about the domestic violence because he "hates" Skippergosh "for some reason." She implied that Castillo lied as well because she will "follow" Francis without question. W.F. also speculated that Castillo's child lied because she was "coached by her mom and my brother because she lives with them." W.F. added that her father was a liar as well, but she did not provide an explanation in that regard. W.F. was "very surprised" when Francis arrived at her apartment that night. She denied that Skippergosh ever dropped the baby that day. W.F. also denied knowing anyone by the name of Heidi Brege or Brian Carver.

When asked about the January 2020 alleged domestic violence, W.F. explained that "I had gotten into a fight with a female downtown from the bar. I can't even remember her name." W.F. later explained that she was "pretty sure [the fight] was at the house." W.F. said that Brege was "lying" about the domestic violence, and she denied telling Brege that Skippergosh assaulted her.

Chris Krajewski, a program director for the Women's Resource Center of Northern Michigan, was qualified to testify as an expert in "intimate partner violence" over Skippergosh's objection. She explained that it was not unusual for victims of domestic violence to remain in the relationship because "oftentimes they believe – they have hope it will get better; the violence will stop." She added that such victims will often minimize or deny the domestic violence because "[m]inimizing the violence really can help someone cope with it."

In his defense, Skippergosh briefly examined Officer Lamont about his interview with W.F.'s father and his drafting of the search warrant in December 2021. Skippergosh then testified on his own behalf, denying that he assaulted W.F. or dropped the baby on the day in question in December 2021. He denied ever assaulting W.F. When asked about the January 2020 alleged domestic assault, Skippergosh explained that on that night in question, W.F. left the house for the evening, and she returned after 12:00 a.m. with four other women. W.F. and the four other women were intoxicated at the time, and at some point, "all hell broke loose. They started wrestling around, flopping all over in that front room." Skippergosh then locked all five women out of the house.

On cross-examination, the prosecution showed Skippergosh a body-camera video from one of the responding officers to the December 2021 incident, and it indicated that W.F. was screaming, "I need somebody's help." When asked about that statement, Skippergosh explained that W.F. was screaming for assistance removing taco meat from the refrigerator. Further, when asked about the January 2020 fight at his house involving the five women, Skippergosh explained that he was unaware of some of the details of the fight because one or two of the women were covering his eyes at the time.

After about 90 minutes of deliberations, the jury found Skippergosh not guilty of attempted assault by strangulation, and guilty of domestic violence and child abuse. At sentencing, Skippergosh objected to the scoring of prior record variable (PRV) 1 at 25 points, arguing that his earlier conviction in federal court for involuntary manslaughter should be scored as a prior low severity felony, not a prior high severity felony. The trial court disagreed, reasoning that the federal statute under which Skippergosh was convicted was "similar" to the Michigan statute concerning manslaughter. In addition, Skippergosh objected to the scoring of offense variable (OV) 3, arguing that because OV 3 was assessed on the basis of the domestic-violence conviction,

the apparent injury to the baby could not be considered when scoring that variable. The trial court again disagreed, reasoning that "the testimony was that the child did suffer an injury that did require medical treatment as a result of [Skippergosh's] actions." The trial court sustained several other objections and ultimately sentenced Skippergosh within the guidelines to a minimum term of 55 months in prison.

This appeal followed. Skippergosh's original appellate counsel filed a brief identifying five issues, Skippergosh himself filed a Standard 4 brief identifying three issues, and second appellate counsel filed a supplemental brief identifying two issues, one of which was previously raised by original appellate counsel. In addition, original appellate counsel filed a motion to remand to the trial court for an evidentiary hearing, which we denied "for failure to persuade the Court of the necessity of a remand at this time." *People v Skippergosh*, unpublished order of the Court of Appeals, entered October 26, 2023 (Docket No. 364127).

## II. ANALYSIS

## A. PRIOR BAD ACTS

Skippergosh argues that the trial court erred by admitting evidence of prior domestic violence under MCL 768.27b. Specifically, Skippergosh argues that the trial court should have excluded evidence of the January 2020 incident involving him and W.F., as it was inadmissible under MCL 768.27b and MRE 403. Skippergosh also argues that the trial court erred by allowing the prosecution to prove the January 2020 incident through the hearsay testimony of Brege because that testimony was not an "excited utterance" under MRE 803(2). We disagree.

We review for an abuse of discretion a trial court's ruling regarding the admission of evidence. *People v Watkins*, 491 Mich 450, 467; 818 NW2d 296 (2012). "A trial court abuses its discretion when it chooses an outcome falling outside the range of principled outcomes." *Id*.

MCL 768.27b(1) provides, in relevant part:

[I]n a criminal action in which the defendant is accused of an offense involving domestic violence or sexual assault, evidence of the defendant's commission of other acts of domestic violence or sexual assault is admissible for any purpose for which it is relevant, if it is not otherwise excluded under [MRE 403].

MRE 403 provided,[4] "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Courts may consider the following factors when applying MRE 403:

---

[4] Effective January 1, 2024 changes were made to the Michigan Rules of Evidence, including the language of MRE 403. This rule is substantively identical in application to that which existed at the time of trial.

(1) the dissimilarity between the other acts and the charged crime, (2) the temporal proximity of the other acts to the charged crime, (3) the infrequency of the other acts, (4) the presence of intervening acts, (5) the lack of reliability of the evidence supporting the occurrence of the other acts, and (6) the lack of need for evidence beyond the complainant's and the defendant's testimony. [*Watkins*, 491 Mich at 487-488.]

Under MCL 768.27b and subject to MRE 403, "prior-bad-acts evidence of domestic violence can be admitted at trial because a full and complete picture of a defendant's history tends to shed light on the likelihood that a given crime was committed." *People v Cameron*, 291 Mich App 599, 610; 806 NW2d 371 (2011) (cleaned up). Thus, under MCL 768.27b, "evidence of other acts of domestic violence is admissible, even to show propensity[.]" *People v Rosa*, 322 Mich App 726, 732; 913 NW2d 392 (2018).

At the time relevant to this case, MRE 803(2) provided:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

\*   \*   \*

(2) Excited Utterance. A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.

"To come within the excited utterance exception to the hearsay rule, a statement must meet three criteria: (1) it must arise out of a startling occasion; (2) it must be made before there has been time to contrive and misrepresent; and (3) it must relate to the circumstances of the startling occasion." *People v Straight*, 430 Mich 418, 424; 424 NW2d 257 (1988) (cleaned up).

The trial court did not abuse its discretion by admitting the hearsay testimony of Brege to prove a prior act of domestic violence under MCL 768.27b. With regard to the hearsay issue, W.F.'s statements to Brege on the night in question in January 2020 satisfied all three elements of the excited-utterance exception. First, the statements unquestionably arose out of a startling condition, namely, an assault. Second, there is evidence that the statements were made before there was time to contrive and misrepresent. In particular, testimony indicated that W.F. was actively bleeding when she made the statements, which suggested that the statements were made shortly after the assault, and Brege said that W.F. appeared to be "scared" at the time. The fact that W.F. was "scared" suggests that she did not have sufficient time after the assault to gather her thoughts to create a misrepresentation. Simply put, it appears that W.F. made her statements a mere few minutes after the assault happened. This satisfies the second element of the excited-utterance exception. Third, and finally, the statements made by W.F. related to the circumstances of the startling occasion, as they noted the perpetrator of the assault. Thus, all three elements of the excited-utterance exception were satisfied, and the trial court did not abuse its discretion by ruling that MRE 803(2) allowed admission of W.F.'s hearsay statements.

With regard to MCL 768.27b and MRE 403, Skippergosh does not dispute that evidence of his alleged prior act of domestic violence in January 2020 presumptively was allowed under the

statute itself, as this case involved a domestic-violence charge and the prior act was relevant to show his propensity to commit domestic violence against W.F. See *Rosa*, 322 Mich App at 732. Instead, Skippergosh argues that the evidence should have been ruled inadmissible under MRE 403. We disagree.

The *Watkins* factors weigh in favor of a conclusion that the evidence was admissible under MRE 403. First, the January 2020 incident and the December 2021 incident were similar, as they both involved Skippergosh assaulting W.F. when they had been consuming alcohol. Second, the acts of domestic violence were less than two years apart, which is not a substantial amount of time. Third, trial testimony clearly implies that Skippergosh had committed other acts of domestic violence against W.F., so the January 2020 incident was not isolated. Fourth, there was no intervening act that would diminish the relevance of the January 2020 incident. Fifth, the evidence that Skippergosh assaulted W.F. in January 2020 was reliable, as it involved not only Brege's testimony, but also W.F.'s blood at the scene and Skippergosh's implausible denials on the witness stand. Sixth, evidence of the January 2020 incident was important for the prosecution's case, as both Skippergosh and W.F. denied that domestic violence occurred in December 2021. Accordingly, the trial court did not abuse its discretion by ruling that evidence of the January 2020 incident was not barred by MRE 403. See *Watkins*, 491 Mich at 487-488.

For these reasons, Skippergosh is not entitled to relief on this issue.

## B. SUFFICIENCY OF THE EVIDENCE

Skippergosh also argues that the prosecution failed to prove the charge of domestic violence beyond a reasonable doubt. Skippergosh observes that both he and W.F. denied at trial that domestic violence occurred, and the three witnesses who testified at trial that they observed domestic violence based their testimony upon "things they heard during video phone calls." We disagree.

"We review de novo a challenge on appeal to the sufficiency of the evidence." *People v Ericksen*, 288 Mich App 192, 195; 793 NW2d 120 (2010). "We examine the evidence in a light most favorable to the prosecution, resolving all evidentiary conflicts in its favor, and determine whether a rational trier of fact could have found that the essential elements of the crime were proved beyond reasonable doubt." *Id.* at 196. "Circumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime." *People v Jackson*, 292 Mich App 583, 587; 808 NW2d 541 (2011) (quotation marks and citation omitted).

In this case, Skippergosh was found guilty of domestic violence as a habitual offender under MCL 750.81(5). "The relevant elements of the charged domestic assault offense include (1) the commission of an assault or an assault and battery and (2) a dating relationship between the parties." *Cameron*, 291 Mich App at 614. The issue before us is whether the evidence was sufficient to show that Skippergosh committed an assault, or an assault and battery, against W.F. It was.

Both Castillo and her 13-year-old child testified that they witnessed Skippergosh strike W.F. on the video chat. In addition, Francis testified that he witnessed a heated confrontation between Skippergosh and W.F. in a manner that would be consistent with domestic violence.

Moreover, Brege testified that W.F. informed her in January 2020 that Skippergosh had assaulted her that night. Finally, Skippergosh provided implausible testimony to explain away these two assaults and the circumstances surrounding them. For example, Skippergosh testified that the January 2020 assault against W.F. was committed by four anonymous women in the living room while they were covering his eyes, and that W.F. was screaming for help in December 2021 because she required assistance removing taco meat from the refrigerator. The trial court, during sentencing, characterized Skippergosh's testimony as "almost laughable in terms of what you tried to convince the jury actually happened." The jury was permitted to infer that his implausible testimony was evidence of guilt. See *Wright v West*, 505 US 277, 296; 112 S Ct 2482; 120 L Ed 2d 225 (1992) ("As the trier of fact, the jury was entitled to disbelieve [the defendant's] uncorroborated and confused testimony. . . . And if the jury did disbelieve [the defendant], it was further entitled to consider whatever it concluded to be perjured testimony as affirmative evidence of guilt[.]").

Accordingly, the evidence was sufficient to establish that Skippergosh was guilty of domestic violence beyond a reasonable doubt.

## C. VOUCHING

Skippergosh next argues that the prosecution impermissibly vouched during its closing argument by arguing that W.F.'s brother, sister-in-law, niece, and father had no motivations for falsely testifying against Skippergosh. Skippergosh relatedly argues that trial counsel was ineffective for failure to object. We disagree with both contentions.

Specifically, Skippergosh challenges the prosecution's statements in its closing argument that:

> These are [W.F.'s] family members. It's her brother, her sister-in-law, her niece, her dad. They aren't here to piss [W.F.] off, and they're not here to get [Skippergosh] in trouble. They just want [W.F.] to be safe. That's why they traveled from Mt. Pleasant to testify. That's why they traveled from Northport to testify.

Because Skippergosh failed to object to the prosecution's closing argument, this issue is unpreserved. See *People v Thomas*, 260 Mich App 450, 453-454; 678 NW2d 631 (2004). To obtain relief for an unpreserved issue, "three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). Finally, "[r]eversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id*. at 763-764 (cleaned up).

"Whether a defendant was deprived of the effective assistance of counsel presents a mixed question of fact and constitutional law. Any findings of fact are reviewed for clear error, while the legal questions are reviewed de novo." *People v Head*, 323 Mich App 526, 539; 917 NW2d 752 (2018) (internal citation omitted). Because the trial court did not hold an evidentiary hearing, our review is "limited to mistakes that are apparent from the record." *Id*.

"The United States and Michigan Constitutions protect a criminal defendant's right to a fair trial. US Const, Am VI; Const 1963, art 1, § 17. This includes the right to the effective assistance of counsel." *People v Isrow*, 339 Mich App 522, 531; 984 NW2d 528 (2021). "Trial counsel's performance is presumed to be effective, and defendant has the heavy burden of proving otherwise." *Id*. "To establish ineffective assistance of counsel, a defendant must show (1) that trial counsel's performance was objectively deficient, and (2) that the deficiencies prejudiced the defendant." *Id*. at 531-532. "A deficiency prejudices a defendant when there is a reasonable probability that but for trial counsel's errors, the verdict would have been different." *Id*. at 532. "Failure to raise a futile objection or advance a meritless argument does not constitute ineffective assistance of counsel." *Id*.

"[T]he prosecutor cannot vouch for the credibility of his witnesses to the effect that he has some special knowledge concerning a witness' truthfulness." *People v Bahoda*, 448 Mich 261, 276; 531 NW2d 659 (1995). "But a prosecutor may comment on his own witnesses' credibility during closing argument, especially when there is conflicting evidence and the question of the defendant's guilt depends on which witnesses the jury believes." *Thomas*, 260 Mich App at 455.

No error occurred here. None of W.F.'s family members testified to having any bias against Skippergosh or W.F. herself. Nor did any of these family members testify to having some other possible ulterior motive that might influence their testimony. While W.F. testified that all of these family members were lying, she provided no plausible explanation for why they would lie, beyond some vague assertions that Francis strongly disliked Skippergosh, Castillo was influenced by Francis, and Castillo's child was influenced by her parents. Thus, in light of the testimony presented at trial, it was reasonable for the prosecution to infer and argue that W.F.'s family members did not have any unusual or impermissible motivations for testifying, and that they were compelled to do so simply out of commonplace concern for the well-being of a family member. Further, nothing in the prosecution's closing argument at issue hints at having special knowledge of the family members' truthfulness or reasons for testifying. See *Bahoda*, 448 Mich at 276. Consequently, no error occurred, and trial counsel cannot be deemed ineffective for failure to raise a futile objection. See *Isrow*, 339 Mich App at 531.

## D. SENTENCING VARIABLES

Skippergosh argues that the trial court erred by scoring PRV 1 at 25 points because his federal involuntary-manslaughter conviction, 18 USC 1112, was a "prior low severity felony conviction," not a "prior high severity felony conviction." Skippergosh also argues that the trial court erred by scoring OV 3 at 10 points on the basis of the injury to the baby because there was no causal connection between the crime of domestic violence and the baby's injury. We disagree with his first contention regarding PRV 1, but agree OV 3 was incorrectly scored.

"Under the sentencing guidelines, the circuit court's factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence." *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). "Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo." *Id*. "A finding of fact is clearly erroneous if, after a review of the entire record, an appellate court is left with a definite and

firm conviction that a mistake has been made." *People v Antwine*, 293 Mich App 192, 194; 809 NW2d 439 (2011) (quotation marks and citation omitted).

MCL 777.51, the statute governing PRV 1, provides, in relevant part:

(1) Prior record variable 1 is prior high severity felony convictions. Score prior record variable 1 by determining which of the following apply and by assigning the number of points attributable to the one that has the highest number of points:

\* \* \*

(c) The offender has 1 prior high severity felony conviction . . . 25 points

\* \* \*

(2) As used in this section, "prior high severity felony conviction" means a conviction for any of the following, if the conviction was entered before the sentencing offense was committed:

(a) A crime listed in offense class M2, A, B, C, or D.

(b) A felony under a law of the United States or another state corresponding to a crime listed in offense class M2, A, B, C, or D.

(c) A felony that is not listed in offense class M2, A, B, C, D, E, F, G, or H and that is punishable by a maximum term of imprisonment of 10 years or more.

(d) A felony under a law of the United States or another state that does not correspond to a crime listed in offense class M2, A, B, C, D, E, F, G, or H and that is punishable by a maximum term of imprisonment of 10 years or more.

The word "corresponding," as used in MCL 777.51(2)(b), means "similar or analogous." *People v Crews*, 299 Mich App 381, 391; 829 NW2d 898 (2013) (quotation marks and citation omitted). " 'Analogous' is defined as 'corresponding in some particular' and 'similar' is defined as 'having qualities in common.' " *Id*. at 391-392 (citation omitted).

The trial court did not err by concluding that Skippergosh's conviction in federal court for involuntary manslaughter, 18 USC 1112, was a "prior high severity felony" under MCL 777.51(2)(b). 18 USC 1112 prohibits involuntary manslaughter, which it defines as an unlawful killing "[i]n the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death." 18 USC 1112(a). This is comparable to involuntary manslaughter in Michigan, which is defined as an unlawful killing that is "neither murder nor voluntary manslaughter nor within the scope of some recognized justification or excuse." *People v Holtschlag*, 471 Mich 1, 21; 684 NW2d 730 (2004) (quotation marks and citation omitted). This definition includes an unlawful killing that is the result of "an unlawful act not amounting to a felony." *Id*. (quotation marks and citations omitted). Thus, the federal law is comparable to the

Michigan law, as both laws essentially prohibit unlawful killings that are the result of unlawful acts. Although the laws are not identical, MCL 777.51(2)(b) only requires that the laws correspond in some respect or have qualities in common, see *Crews*, 299 Mich App at 391-392, which is the case here. Further, MCL 777.16p provides that involuntary manslaughter is a Class C felony. Because involuntary manslaughter is a Class C felony, and because Skippergosh was convicted in federal court of a felony corresponding to that Class C felony, the trial court correctly scored PRV 1 at 25 points.

MCL 777.33, the statute governing OV 3, provides, in relevant part:

> (1) Offense variable 3 is physical injury to a victim. Score offense variable 3 by determining which of the following subdivisions apply and by assigning the number of points attributable to the applicable subdivision that has the highest number of points:

> \* \* \*

> (d) Bodily injury requiring medical treatment occurred to a victim . . . 10 points

"[T]he offense variables are scored by reference only to the sentencing offense, except where specifically provided otherwise." *People v McGraw*, 484 Mich 120, 129; 771 NW2d 655 (2009). "OV 3 does not specifically provide otherwise; therefore, we can only take into consideration [a] defendant's sentencing offense for purposes of scoring OV 3." *People v Biddles*, 316 Mich App 148, 165; 896 NW2d 461 (2016).

While OV 3 can only be scored by referencing the sentencing offense, the scoring need not be limited to the sole victim of the charged offense. *People v Albers*, 258 Mich App 578, 593; 672 NW2d 336 (2003). More to the point, " . . . for the purposes of OV 3, the term 'victim' includes any person harmed by the criminal actions of the charged party." *Id*. The trial court did not find that W.F. suffered injuries that required medical treatment but rather that the baby did. On the basis of this record, we cannot find support by a preponderance of the evidence that the baby was dropped during the course of domestic violence. Undoubtedly, there is testimony that the injury to the baby and to W.F. happened in the same location. Castillo testified that W.F. was grabbed by the neck, hit in the face, and the baby was dropped all within the living room of the home W.F. and Skippergosh shared. What is lacking though, is what is required by *McGraw*, evidence that the harm to the child happened during the course of the domestic violence offense for which Skippergosh was being sentenced. In fact, there is some record evidence to suggest it did not. Castillo's child testified that the incident that spurred her family into action was the dropping of the baby, which happened while she and her family were still at home in Mount Pleasant. Castillo's child testified that she did not see W.F. get struck in the face until they were in the car and on their way to Petoskey. Francis testified that he was speaking with W.F. as she was seated on her couch when he heard the baby fall to the ground. This testimony tends to show that the injury to the baby did not occur during the course of the domestic violence.

It is plausible and even likely that an assault was ongoing, in that W.F. was in fear of battery until the police arrived, as the dissent suggests. However, there is no record evidence of that.

-12-

Instead, we have testimony from family members about separate and distinct incidents of battery, one which Skippergosh was acquitted of. Consequently, the trial court erred by ruling that the sentencing offense of domestic violence caused "[b]odily injury requiring medical treatment . . . to a victim." MCL 777.33(1)(d). With zero points for OV 3, Skippergosh's OV total changes from 40 points (Level IV) to 30 points (Level III), and his guidelines change to 12-48 months. Thus, resentencing is required. *People v Francisco*, 474 Mich 82, 90 n 8; 711 NW2d 44 (2006).

## E. ACQUITTED CONDUCT

Because resentencing is afforded by the guidelines scoring, we decline to address any additional issues with Skippergosh's sentence. We do note, however, that the jury acquitted Skippergosh of attempted assault by strangulation. Yet, at sentencing, the trial court began what was ultimately a lengthy explanation of its sentence with:

> [i]t is supported that [Skippergosh] attempted to choke his living-together partner, [W.F.], and the mother of his son [], and that he hit her; also that he dropped his child on the ground resulting in a swollen area of the child's temple, and him having to be seen at the E.R.

The trial court went on for seven more transcript pages discussing Skippergosh's prior record, history with alcohol abuse, lack of employment, presence or absence in his childrens' lives, and education. Simply put, a lot more is said about Skippergosh after the trial court's finding that he attempted to choke his partner. Skippergosh was sentenced to a minimum of 55 months in prison, near the top of his guidelines range of 14 months to 58 months.

So, here, we do not have a sentence falling well outside the guidelines, where it is clear from the record that "the sentencing court punished the defendant *more severely* on the basis of the judge's finding by a preponderance of the evidence that the defendant committed the murder of which the jury had acquitted him." *People v Beck*, 504 Mich 605, 629-630; 939 NW2d 213 (2019) (emphasis added). We also do not have a guidelines variable scored based on acquitted conduct where the reliance on acquitted conduct is apparent in the requisite fact-finding in advance of assessing points for each variable. Yet, we do not have a complete absence of an on-the-record consideration of acquitted conduct. *See People v Stokes*, 333 Mich App 304, 312; 963 NW2d 643 (2020) (holding that the defendant was not entitled to resentencing because the mention of acquitted conduct was limited to the pre-sentence investigation report and not elsewhere on the record and "[h]ad the sentencing court specifically referenced acquitted offenses as part of its sentencing rationale, a *Beck* violation would be apparent."). Instead, we have a situation where the sentencing judge, not in response to anything that was said at sentencing,[5] but rather at the beginning of an extensive explanation of its chosen sentence, referenced acquitted conduct.

---

[5] *See People v Beesley*, 337 Mich App 50, 65; 972 NW2d 294 (2021) ("The trial court . . . did apparently believe that a gun was used, which amounted to a finding of fact contrary to acquitted conduct . . . [but] for there to be a *Beck* violation, the trial court's reference to the gun would have to have been part of its sentencing rationale. The trial court made reference to the [the]defendant's use of a gun only in response to defense counsel's argument that [the] defendant had not committed a violent offense.")

We cannot say for certain, based on this record, that Skippergosh's within-guidelines minimum sentence of 55-months minimum was higher as a result of that consideration. But, just as a departure from the guidelines was evidence of acquitted conduct increasing a sentence in *Beck*, would it not follow that *any* sentence above the minimum guidelines, where acquitted conduct was considered, is also a *Beck* violation?

And, is an *increased* sentence truly necessary? *Beck* was decided as a matter of due process. Specifically, "a defendant is entitled to a presumption of innocence as to all charged conduct until proven guilty beyond a reasonable doubt, and that presumption is supposed to do meaningful constitutional work as long as it applies." *Beck*, 504 Mich at 621. While in *Beck*, our Supreme Court ultimately determined that Eric Beck was punished more severely based on acquitted conduct, the problem was with the process of considering that conduct at all, not its outcome, because as the holding of *Beck* dictates— " . . . reliance on acquitted conduct at sentencing is barred by the Fourteenth Amendment." *Id*. at 629. So, perhaps then, reliance is enough. And we have that here.

Yes, the mention of acquitted conduct is brief and one of many things considered by the trial court. But what would be greater evidence of reliance than the court citing acquitted conduct at the start of its explanation for the sentence it ultimately imposes? Consider the court's other referenced considerations—Skippergosh's prior record, educational attainment, and myriad other individualized factors. These, too, were never followed with an express statement that "I am using this to calculate Skippergosh's sentence" and yet, we would not second guess that they were part of the court's sentencing determination. We refrain from requiring more than an express reference to acquitted conduct in advance of sentencing as evidence that acquitted conduct was relied upon in issuing a sentence.

We further note that the dissent, majority, and former Chief Justice all agree on one thing: the Court of Appeals has made it "plain" that it is "struggling with the boundaries of [the] holding in *Beck*." Maybe this is the "right case" for clarifying the law in this area. *People v Stokes*, 507 Mich 939; 957 NW2d 824 (2021).

Because we are remanding for resentencing based on the incorrect scoring of OV 3, we use this opportunity to also remind the sentencing judge that a person's due process rights are violated when the sentencing court relies on acquitted conduct, even if just in minor part.

F. INEFFECTIVE ASSISTANCE

In his Standard Four brief, Skippergosh argues that trial counsel was ineffective because he failed to challenge Krajewski's testimony before trial; failed to argue that the prosecutor's office had a conflict of interest; failed to move for an extension after the prosecution notified him in October 2022 that it would use a technician's report in lieu of testimony, thereby suggesting a violation of *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963); failed to object to introduction of photographs of suspected blood, where the suspected blood was not tested for confirmation of that fact; failed to object to DNA evidence taken from the bloody sock; failed to fully investigate the medical records for the baby; failed to move for a mistrial after the trial court

criticized him during trial before the jury; failed to object to the jury instructions for child abuse and domestic assault; and failed to request a special-verdict form.[6]

Most of these arguments are meritless and may be disposed of summarily. The fact that trial counsel failed to object to Krajewski's testimony before trial is irrelevant because he adequately objected during trial. There is nothing in the record to suggest that the prosecution violated *Brady*. Skippergosh has cited no authority for the proposition that the police are required to test every single suspected blood pattern to determine whether it actually is blood and, in any event, the parties agree that W.F. was assaulted in the parties' home in January 2020. Skippergosh has not explained why it would have aided his case to object to DNA evidence taken from the bloody sock or further investigated the baby's medical records. Finally, Skippergosh has not identified any prejudicial statements by the trial court during trial, nor has he identified any legal error with the jury instructions as provided, or the fact that the jury was not given a special-verdict form. For these reasons, Skippergosh has not satisfied his burden of showing that he is entitled to relief for any of these arguments relating to ineffective assistance of counsel. See *Isrow*, 339 Mich App at 531-532.

However, we acknowledge that Skippergosh's argument regarding the potential conflict of interest in the prosecutor's office requires closer consideration.[7] "[O]nce a defendant has shown that a member of the prosecutor's office counseled him or represented him in the same or related matter, a presumption arises that members of the prosecutor's office have conferred about the matter." *People v Davenport*, 280 Mich App 464, 472; 760 NW2d 743 (2008). "To rebut the presumption of shared confidences, the prosecutor must show that effective screening procedures have been used to isolate the defendant's former counsel from the prosecution of the substantially related criminal charges." *Id*. (quotation marks and citation omitted). Thus, when it is shown that a member of the prosecutor's office represented the defendant in the same or a substantially related matter, an evidentiary hearing is required to determine such issues as "whether the prosecutor's office utilized formal screening procedures," "whether [the attorney] participated in any aspect of the prosecution of the case," and whether the prosecutor's office "implemented measures to prevent improper communications and that it consistently followed through with these measures." *Id*. at 474-475.

Here, Graham clearly did not represent Skippergosh in the "same" matter. Nor, we conclude, did he represent Skippergosh in a "substantially related" matter. See *id*. To determine whether two proceedings are "substantially related," "[t]he question is whether the same or

---

[6] Skippergosh may have raised other arguments in his Standard 4 brief, but we address only those we can clearly identify.

[7] Stephen Graham represented Skippergosh in the M.O. domestic-violence criminal case, and he subsequently became an attorney within the Emmet County Prosecutor's Office and held that position during the instant proceedings. Notably, that criminal case involving M.O. only resulted in a conviction for disturbing the peace. At the September 2022 motion hearing in this case, the trial court ruled that attorney-client privilege did not bar evidence about domestic violence against M.O. because "you would have to have direct evidence that Mr. Graham committed such a flagrant violation of the attorney/client privilege, which would be not something that I would take lightly at all in making that determination."

inextricably related facts, circumstances or legal questions are at issue in both proceedings, not whether both charges are for the same criminal offense, or both offenses involve guns, drugs, or other specific facts." *Landers v State*, 256 SW3d 295, 307 (Tex Ct Crim App, 2008) (footnotes omitted). "The simplest form of this analysis may be framed as whether the current prosecution is predicated on the prior representation. The analysis also must provide an extra measure of protection to the criminal defendant and inquire whether a relationship exists between the legal issues involved in the pertinent cases." *Gatewood v State*, 388 Md 526, 544-545; 880 A2d 322 (Md Ct App, 2005). The domestic-violence case in which Graham represented Skippergosh involved a different victim than this case. More importantly, though, evidence of that domestic-violence case was not introduced against Skippergosh in this case. In fact, because that domestic violence case only resulted in a conviction for disturbing the peace, it did not provide the basis for escalated habitual offender penalties under MCL 750.81(5) in this case. In other words, while the two cases were superficially similar, they did not involve overlapping legal issues or facts, beyond the fact that Skippergosh was accused of committing domestic violence in both cases. Finally, while not dispositive of our analysis, we note that Skippergosh has not alleged, much less shown, that Graham actually shared any confidential information with the prosecutor's office to prejudice his case. Compare *People v Loew*, ___ Mich ___, ___; ___ NW3d ___ (2024) (Docket No. 164133); slip op at 28-29 (holding that a violation of the Michigan Code of Judicial Conduct did not warrant relief because the defendant did not show a miscarriage of justice or deprivation of a constitutional right).

Accordingly, we conclude that because the two domestic-violence cases were not "substantially related," trial counsel was not ineffective for failing to move for an evidentiary hearing, particularly where the parties and the trial court were aware of the previous attorney-client relationship between Graham and Skippergosh, and the matter was discussed and resolved on the record. Thus, Skippergosh is not entitled to relief on this issue. See *Isrow*, 339 Mich App at 531-532.

## G. MISSING TRANSCRIPTS

Skippergosh argues that he is entitled to relief because, among other reasons, the trial transcript does not reflect that trial counsel objected to introduction of his telephone call from jail, does not reflect trial counsel's full objections to Krajewski's testimony, and does not include Detective Lamont's original testimony. We disagree that Skippergosh is entitled to relief.

We review de novo whether a defendant is entitled to a new trial on the basis of missing or erroneous transcripts. See *People v Craig*, 342 Mich App 217, 225; 994 NW2d 792 (2022). "[T]he inability to obtain the transcripts of criminal proceedings may so impede a defendant's right of appeal [under Const 1963, art 1, § 20] that a new trial must be ordered." *People v Horton (After Remand)*, 105 Mich App 329, 331; 306 NW2d 500 (1981). In *Craig*, 342 Mich App 217, we explained the relevant constitutional principles as follows:

> The failure of the state to provide a transcript when, after good faith effort, it cannot physically do so, does not automatically entitle a defendant to a new trial. For example, if a defendant argues that they were not given statutory notice of the right to a jury trial and there is no transcript of the relevant proceeding, the "presumption of regularity" applies, and in the absence of substantial proofs to the

contrary, it will be presumed that the official discharged their public duty in this regard. Moreover, when the surviving record is sufficient to allow evaluation of the appeal, the defendant's constitutional right is satisfied. Whether a record is sufficient in a particular case will of course depend upon the questions that must be asked of it. That is, where only a portion of the trial transcript is missing, the surviving record must be reviewed in terms of whether it is sufficient to allow evaluation of [a] defendant's claim on appeal. [*Id*. at 226-227 (cleaned up).]

"In addition to the constitutional rights requiring a sufficient record of trial proceedings, MCR 8.108(B)(1) provides that '[t]he court reporter or recorder shall . . . take a verbatim record' of most court proceedings." *Id*. at 227. "If a criminal defendant discovers during the pendency of an appeal that a transcript is unavailable, the defendant must file 'a motion to settle the record and, where reasonably possible, a proposed statement of facts' to serve as a substitute for the transcript. MCR 7.210(B)(2)(a)." *Id*. at 228. "A proposed statement of facts must concisely set forth the substance of the testimony from the missing transcript in sufficient detail to provide for appellate review." *Id*. (cleaned up).

The purported transcript errors identified by Skippergosh are irrelevant to the claims presented on appeal or nonexistent. For example, Skippergosh asserts that the transcript does not include trial counsel's full objection to Krajewski's testimony. However, the transcripts actually indicate that counsel and the trial court discussed the matter of her testimony off the record, and then trial counsel memorialized his objection on the record. This is a routine method of addressing issues that arise during trial and does not indicate that a transcript is erroneous. Moreover, because trial counsel's objection was preserved, our review of the appellate issue involving her testimony is not impeded. See *id*. In other words, because the objection was preserved on the record, Skippergosh is not held to a heightened standard of review on appeal. Similarly, while Skippergosh asserts that the transcripts do not reflect a continuing objection to Brege's hearsay testimony, trial counsel's earlier objection was sufficient to preserve the issue.

We acknowledge one peculiarity identified by Skippergosh in his brief, but not his affidavit. The transcript for the third day of trial indicates that Officer Lamont was "recalled" to testify, with the trial court reminding him that he remained under oath. Further, a question posed by trial counsel to Officer Lamont implies that he testified on the second day of trial. However, the transcripts do not reflect any previous testimony by Officer Lamont, either on the second or first day of trial. Nonetheless, because Skippergosh does not raise this issue in his affidavit, nor have any appellate issues been raised regarding Officer Lamont, further proceedings are not warranted. Consequently, we conclude that Skippergosh has not shown a due-process violation or violation of the court rules for the allegations of error identified in his affidavit.

## H. JUDICIAL MISCONDUCT

Skippergosh finally argues that the trial judge committed judicial misconduct in multiple respects, including failure to recognize the prosecution's *Brady* violations, overlooking the prosecution's conflict of interest, and having "a pattern of biased commentary in front of the jury." We disagree.

"The question whether judicial misconduct denied [a] defendant a fair trial is a question of constitutional law that this Court reviews de novo." *People v Stevens*, 498 Mich 162, 168; 869 NW2d 233 (2015). "[O]nce a reviewing court has concluded that judicial misconduct has denied the defendant a fair trial, a structural error has occurred and automatic reversal is required." *Id*.

"[A]djudication by [a] biased judge" requires a new trial. *Rose v Clark*, 478 US 570, 577; 106 S Ct 3101; 92 L Ed 2d 460 (1986). In addition, Michigan Code of Judicial Conduct, Canon 2, provides that "[a] judge must avoid all impropriety and appearance of impropriety."

We have reviewed the record of the proceedings below and find nothing that would indicate bias or impropriety by the trial judge. Comments by the trial judge during these proceedings were straightforward and routine, and rulings by the trial judge indicate an objective application of the law. Indeed, the trial judge repeatedly ruled in favor of Skippergosh on important issues, such as prior bad acts and the scoring of the sentencing variables. Moreover, while Skippergosh faults the trial judge for overlooking the possible conflict of interest within the prosecution's office, the trial judge actually noted on the record that a serious problem would exist if there was evidence that Graham violated attorney-client privilege. Thus, there is no basis to grant Skippergosh relief on this issue.

## I. INTIMATE-PARTNER VIOLENCE

In his supplemental brief prepared by his successor appellate counsel, Skippergosh argues that the trial court erred by admitting expert testimony from Krajewski regarding intimate-partner violence. Skippergosh reasons that the testimony should have been barred under MRE 702. We disagree.[8]

We review for an abuse of discretion a trial court's ruling regarding the admission of evidence. *Watkins*, 491 Mich at 467. At the time relevant to this case, MRE 702 provided as follows:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

"A court considering whether to admit expert testimony under MRE 702 acts as a gatekeeper and has a fundamental duty to ensure that the proffered expert testimony is both relevant and reliable." *People v Kowalski*, 492 Mich 106, 120; 821 NW2d 14 (2012). "[E]ven proposed expert testimony that is offered by a qualified expert and based on reliable scientific data and methods may be properly excluded if it is not relevant to the facts of the case or is offered for a proposition that does not require the aid of expert interpretation." *Id*. at 122.

---

[8] Skippergosh also raises a second issue in his supplemental brief that is identical to the fifth issue raised in his original brief on appeal.

In *People v Christel*, 449 Mich 578; 537 NW2d 194 (1995), our Supreme Court approved "expert testimony of the battered woman syndrome so that the expert may, when appropriate, explain the generalities or characteristics of the syndrome." *Id*. at 591.[9] The Court "permit[ted] testimony regarding specific behavior where relevant and helpful to the factfinder." *Id*. However, "the expert cannot opine that complainant was a battered woman, may not testify that defendant was a batterer or that he is guilty of the crime, and cannot comment on whether complainant was being truthful." *Id*. "Generally, expert testimony is needed when a witness' actions or responses are incomprehensible to average people. This may include, for example, when a complainant endures prolonged toleration of physical abuse and then attempts to hide or minimize the effect of the abuse, delays reporting the abuse to authorities or friends, or denies or recants the claim of abuse." *Id*. at 592.[10]

In this case, Skippergosh does not dispute, as a general matter, Krajewski's expert qualifications to testify. Rather, Skippergosh argues that her testimony was inadmissible for two reasons. First, Skippergosh contends that "Ms. Krajewski testified that she did not know anything regarding the alleged victim. Thus, it was impossible for her to have provided testimony that would have been helpful to the jury." Second, Skippergosh contends that, as this Court stated in *People v Adams*, unpublished per curiam opinion of the Court of Appeals, issued April 9, 1999 (Docket No. 205938), " 'while the testimony was interesting and instructive with regard to patterns of domestic violence, it had no applicability or relevance to this case where there was no indication that there was a pattern of violence.' " *Id*. at pp 2-3. We disagree.

Krajewski's testimony fits within the confines outlined by our Supreme Court in *Christel*. Given that there was evidence of at least two instances of domestic violence committed by Skippergosh against W.F., and Skippergosh and W.F. were in a romantic relationship at the time, W.F. satisfied the definition of "battered woman." See *Christel*, 449 Mich at 588. Further, given that W.F. hid from the police in the bathroom after the January 2020 assault when the police arrived to investigate, and given that W.F. denied at trial that any assault occurred in December 2021 despite multiple witnesses testifying otherwise, it is apparent that she had a pattern of concealing and denying domestic violence by Skippergosh. Our Supreme Court expressly recognized that expert testimony regarding intimate-partner violence may be appropriate in these circumstances. See *id*. at 592 (explaining that expert testimony may be appropriate to explain "when a complainant endures prolonged toleration of physical abuse and then attempts to hide or minimize the effect of

---

[9] "Intimate Partner Violence" has replaced the prior term "Battered Women's Syndrome." See *People v Brackins*, 37 Cal App 56, 68; 249 Cal Rptr 3d 261 (Cal Ct App, 2019). Our Supreme Court explained that "battered woman" refers to "a woman who is repeatedly subjected to any forceful, physical or psychological behavior by a man in order to coerce her to do something he wants her to do without any concern for her rights," and "in order to be classified as a battered woman, the couple must go through the battering cycle at least twice." *Christel*, 449 Mich at 588 (quotation marks and citation omitted).

[10] Ultimately, in *Christel*, our Supreme Court ruled that the expert testimony at issue was inadmissible, reasoning that "[b]ecause complainant has consistently maintained that the relationship ended in December and there is no evidence that complainant hid or minimized, delayed reporting, or recanted the abuse, we reject the prosecution's contention that the battered woman syndrome was relevant in this case." *Id*. at 597.

the abuse, delays reporting the abuse to authorities or friends, or denies or recants the claim of abuse"). Thus, the trial court did not abuse its discretion by allowing Krajewski to testify as an expert regarding intimate-partner violence.

Neither of Skippergosh's arguments to the contrary have merit. First, while Skippergosh argues that Krajewski was not familiar with the facts of the case, such familiarity is not required. To the contrary, such expert testimony only is admissible to "explain the generalities or characteristics of the syndrome." *Christel*, 449 Mich at 591. The expert cannot opine on whether the Skippergosh is guilty or the complainant is being truthful. *Id*. Therefore, Krajewski appropriately testified to generalities without opining on the facts of the case, as is common in many criminal cases requiring behavioral expert testimony. Compare *People v Ackerman*, 257 Mich App 434, 444; 669 NW2d 818 (2003) ("Applying the general test for the admission of expert testimony, we conclude that the trial court did not abuse its discretion by permitting Niffeler to testify regarding common practices of child molesters."). Second, while Skippergosh correctly observes that this Court in *Adams* ruled that the expert testimony on intimate-partner violence was inadmissible, *Adams* is wholly distinguishable. In *Adams*, the only reason why this Court ruled that the testimony was inadmissible was the fact that the evidence only indicated one instance of domestic violence, so the complainant was not a "battered woman." *Adams*, unpub op at 2. Here, in contrast, there were two instances of domestic violence, thus satisfying the definition of "battered woman." See *Christel*, 449 Mich at 588.

Accordingly, no relief is warranted on this issue.

## V. CONCLUSION

We affirm Skippergosh's convictions and remand for resentencing. We do not retain jurisdiction.

/s/ Adrienne N. Young
/s/ Randy J. Wallace